**In the Interest of L.M.I. and J.A.I., minor children.**

No. 02–0244.

Supreme Court of Texas.

Argued Feb. 5, 2003.

Decided Sept. 18, 2003.

Rehearing Denied Dec. 12, 2003.

Wainwright, J., joined in part and concurred separately in part with opinion.

Owen, J., concurred in part and dissented in part with opinion in which Phillips, C.J., joined, and Hecht and Jefferson, JJ., joined in part.

Hecht, J., dissented with opinion in which Jefferson, J., joined.

Shawn Casey, Houston, Maria Luisa Mercado, Galveston, Kathleen M. McCumber, Cagle & McCumber, League City, for Petitioner.

Otto D. Hewitt, III, Christine L. Mangle, Texas City, Emily A. Fisher, Martin, Garza & Fisher, Galveston, for Respondent.

Justice O'NEILL delivered the Court's judgment, and the opinion of the Court as to Parts I, II, and IVA, in which Justice ENOCH, Justice SCHNEIDER, Justice SMITH, and Justice WAINWRIGHT joined, and an opinion as to Part III and IVB, in which Justice ENOCH, Justice SCHNEIDER, and Justice SMITH joined.

Almost four years ago, Ricardo Duenas and Luz Sylvestre Inocencio signed sworn affidavits of voluntary relinquishment of their parental rights to five-month-old twin boys. At the same time, they placed the boys in the care of Miles and Monica Montegut, a couple who wanted to adopt them. The boys have grown from infants to toddlers to pre-school age children in the Monteguts' care as this case has taken its excruciatingly slow course through our judicial system. Duenas and Inocencio have been represented by counsel since the beginning of their quest to set the affidavits aside. As today's fractured opinions illustrate, appellate review has been greatly hampered by the shifting, indistinct focus of their complaints—although the case has been pending for more than a year, we still disagree about what the complaints are and whether they were preserved. In this context, adhering to our preservation rules isn't a mere technical nicety; the interests at stake are too important to relax rules that serve a critical purpose. As we recently said, "[a]ppellate review of potentially reversible error never presented to a trial court would undermine the Legislature's dual intent to ensure finality in these cases and expedite their resolution."

*In re B.L.D. and B.R.D.,* 113 S.W.3rd 340, 353 (Tex.2003); *see also* TEX. FAM.CODE § 161.211(a) (prohibiting direct or collateral attack on order terminating parental rights based on affidavit of relinquishment after six months). Injecting any greater uncertainty and complexity into the process would only serve to discourage potential adoptive parents, who are already turning to simpler and less expensive foreign adoptions in record numbers. *See* Genard C. Armas, *Many U.S. Parents Look Abroad to Adopt, Census Bureau Says,* MIAMI HERALD, Aug. 22, 2003, available at http://www.miami.com/mld/miami herald/2003/08/22/news/nation/6591007. htm; UNITED STATES CENSUS BUREAU, UNITED STATES DEPARTMENT OF COMMERCE, ADOPTED CHILDREN STEPCHILDREN: 2000–11 (Aug. 2003).

Here, after hearing evidence regarding the circumstances surrounding the affidavits' execution and the boys' best interests, the trial court ordered termination of Duenas's and Inocencio's parental rights. The court of appeals affirmed. 117 S.W.3d 1. Duenas argues that the affidavit he signed was procured in a manner that violated his right to due process because he neither speaks nor reads English, and the affidavit was not translated into Spanish. We granted Duenas's petition for review to consider this constitutional issue, but on further review we conclude that the issue was not preserved. We also granted Inocencio's petition for review to decide whether the order terminating her parental rights should be set aside because her relinquishment affidavit was procured as the result of fraud or undue influence. A majority of the Court concludes that the record contains legally sufficient evidence to support termination of her parental rights. Accordingly, we affirm the court of appeals' judgment.

## I

In April 1999, fifteen-year-old Inocencio gave birth prematurely to twin boys, L.M.I. and J.A.I., allegedly fathered by twenty-five-year-old Ricardo Duenas. Duenas and Inocencio were not married or living together at the time. At some point before the boys' birth, Inocencio had become acquainted with Texas City police detective Brian Goetschius, who had responded to a report that Inocencio was working as a nude dancer at a sexually oriented business. Detective Goetschius began offering Inocencio occasional advice, sometimes at her mother's behest. After learning of her pregnancy, Goetschius drove Inocencio to several doctor's appointments and helped her apply for governmental assistance. Five months after the boys were born, Inocencio's sister, Esther Gonzalez, contacted the detective asking for help in placing the children for adoption. Eventually, Goetschius and his wife, Dawnell, arranged for the children to be adopted by Monica and Miles Montegut, Dawnell's sister and brother-in-law.

On September 24, 1999, Gonzalez went to her mother's home, where Inocencio and the boys lived, and told Inocencio that the Monteguts wanted to adopt the children. Gonzalez, Inocencio, and their mother, Guillerma Pruitt, all testified that Inocencio at first rejected the idea of allowing the adoption, but was ultimately persuaded that it would be in the boys' best interest. Gonzalez then drove Inocencio, the twins, and Pruitt to pick up Duenas at the restaurant where he worked. The group proceeded to the office of the Monteguts' attorney, Mark Ciavaglia, who had prepared irrevocable affidavits of relinquishment of parental rights for Inocencio and Duenas to sign. Duenas, a Honduran citizen, testified that he does not understand English, that none of the affidavit was translated for him, and that he did not understand

the affidavit's import. Other witnesses testified that Duenas appeared to understand Ciavaglia's explanation of the affidavit, and that significant portions of the affidavit were translated. Ciavaglia then explained the affidavit to Inocencio, who testified that Ciavaglia advised her not to sign if she had any reservations. Inocencio initially refused to sign the affidavit, but changed her mind after the adoptive parents agreed to send her pictures and information about the boys' condition twice a year. After both Inocencio and Duenas signed their respective affidavits, they left the boys with Ciavaglia to be surrendered to the Monteguts.

A few days later, Inocencio had a change of heart and decided to pursue legal action to regain custody of the children. On October 1, 1999, the Monteguts filed their petition to terminate the parent/child relationship. The same day, the trial court issued a temporary order giving the Monteguts custody of the children. Three days later, Inocencio filed a motion to revoke her affidavit. On November 17, 1999, Duenas filed his answer to the Monteguts' petition and a counter-petition for voluntary paternity. He also filed a motion to revoke his affidavit of relinquishment.

On November 23, 1999, the trial court held a hearing on the motions to revoke the affidavits to determine whether the affidavits were executed involuntarily. After hearing testimony from nine witnesses, the trial court found that the affidavits were voluntarily executed. The court also found that Duenas was not the children's presumed father, and that the legal parent-child relationship did not exist at the time Duenas signed his affidavit of relinquishment. The trial court further found by clear and convincing evidence that it was in the children's best interest to terminate Duenas's and Inocencio's parental rights. The court ordered Duenas's and Inocencio's rights terminated, and awarded the Monteguts custody of the children. The court of appeals affirmed the trial court's decision. 117 S.W.3d 1.

## II

■ Duenas's petition for review argues that "the order terminating [his] parental rights should be set aside since [his] signature on the affidavit of relinquishment was procured in a manner that violated [his] due process rights." Upon further review of the record, we conclude that Duenas failed to preserve this issue in the trial court. His answer and counterpetition to the termination proceedings cite no constitutional authority, and he did not raise the issue in any post-judgment motion. In fact, the only reference to the constitution in the entire record appears when Duenas's attorney, in arguing for a continuance, explained that she had only recently been hired after Duenas's coworkers told him that the termination "was probably not constitutional and not right." Duenas's "Revocation of Affidavit" merely states that "[t]he Affidavit of Relinquishment was not translated for me." The trial court obviously did not discern a due process challenge in Duenas's argument, because the court specifically found that "RICARDO DUENAS present[sic] issues of fraud, duress, and overreaching to the Court to deny that his Father's Affidavit of Relinquishment of Parental Rights was signed voluntarily." *See Vela v. Marywood*, 17 S.W.3d 750, 760 (Tex.App.-Austin 2000, pet. denied, 53 S.W.3d 684 (Tex.2001) (noting that at common law "the word 'fraud' refers to an ... omission, or concealment in breach of a legal duty ... when the breach causes injury to another or the taking of an undue and unconscientious advantage")).

■ Duenas, who was represented by counsel, sought no finding and raised no

legal argument before the trial court about a constitutional claim. Given that Duenas was afforded an extensive evidentiary hearing on the voluntariness of his affidavit, it was not apparent from the context that Duenas was attempting to raise a due process challenge. Under our Rules of Appellate Procedure, a party must present to the trial court a timely request, motion, or objection, state the specific grounds therefor, and obtain a ruling. TEX.R.APP. P. 33.1. As noted above, allowing appellate review of unpreserved error would undermine the Legislature's intent that cases terminating parental rights be expeditiously resolved, thus " '[p]romot[ing] the child's interest in a final decision and thus placement in a safe and stable home.' " *In re B.L.D. and B.R.D.*, 113 S.W.3d at 353 (quoting *In re J.F.C.*, 96 S.W.3d 256, 304 (Tex.2002)). Both we and the United States Supreme Court have held that constitutional error was waived in comparable circumstances. *See Webb v. Webb*, 451 U.S. 493, 496–97, 101 S.Ct. 1889, 68 L.Ed.2d 392 (1981) (holding that constitutional error was waived, even though petitioner repeatedly used the phrase "full faith and credit," because petitioner did not cite to the federal Constitution or to any cases relying on the Full Faith and Credit Clause of the federal Constitution); *Tex. Dep't of Protective and Regulatory Servs. v. Sherry*, 46 S.W.3d 857, 860–61 (Tex.2001) (holding that alleged biological father who sought to establish paternity waived constitutional error, though it was undisputed that father had received no notice or hearing on prior paternity adjudication that created bar). Accordingly, we hold that the due process argument Duenas raises here was not preserved below.

■ And due process is the only argument that Duenas raises here. Nowhere does he present the issue that Justice Hecht and Justice Owen pose, that there is not clear and convincing evidence of a statutory ground for reversal. 119 S.W.3d at 730 (HECHT, J. dissenting); 119 S.W.3d at 716 (OWEN, J., dissenting). At oral argument, Duenas's attorney expressly disavowed any argument that his affidavit did not comply with the statute:

JUSTICE OWEN: Are you also making a statutory argument that it doesn't comply with the statute?

DUENAS'S ATTORNEY: As it relates to him, I've not made any statutory argument.

OWEN: Your only argument was due process?

CASEY: Yes.

That concession was entirely consistent with Duenas's briefing, which states the issue presented is "Should the order terminating RICARDO's parental rights be set aside since RICARDO's signature on the affidavit of relinquishment of his parental rights was procured in a manner that violated RICARDO's due process rights?" Because the only issue presented in Duenas's petition for review was not preserved, we affirm the court of appeals' judgment as to Duenas.

### III

■ Inocencio argues that the order terminating her parental rights should be set aside because it was procured in exchange for unenforceable promises and as the result of illegal conduct by Detective Goetschius, his wife, and Esther Gonzalez. Inocencio argues that the Monteguts' promise to provide periodic information and photographs of the boys was unenforceable as a matter of law, citing *Vela*. Because the promise was unenforceable, she argues, the promise fraudulently induced her to sign the affidavit of relinquishment.

Inocencio filed no pleadings or post-trial motions in the trial court challenging the

enforceability of the Monteguts' promise, even though she, like Duenas, was represented by an attorney. The only documents Inocencio presented in the trial court were her "Revocation of Affidavit," and a handwritten letter attached to a letter from the attorney who had been representing her mother in her effort to be named the twins' managing conservator in which Inocencio states that "[t]he only reason [the boys] are not with us now is because of my sisters [sic] threats and badgering." Inocencio's revocation states only that "[i]t is my desire to revoke [the affidavit of relinquishment]." While there is evidence that the promise of pictures and updates played a significant role in Inocencio's decision to sign the affidavit, her argument about the enforceability of that promise was never raised or ruled upon. Inocencio thus waived this challenge to the affidavit, and we express no opinion on it. *See In re Barr*, 13 S.W.3d 525, 555 (Tex.Rev.Trib.1998); *Tarrant County Water Control and Imp. Dist. Number One v. Fullwood*, 963 S.W.2d 60, 72 (Tex.1998).

■ Inocencio also contends that Detective Goetschius, his wife, and Gonzalez acted as adoption intermediaries without meeting the requirements of Chapter 42 of the Human Resources Code; consequently, she argues, their actions amount to undue influence in her decision to relinquish her parental rights. But like her argument regarding the purported unenforceability of the Monteguts' promises, Inocencio never raised or secured a ruling on this theory in the trial court. Accordingly, it too is waived.

## IV

### A.

A brief response to the dissenting justices' depiction of the record in this case is warranted. Both dissents effectively second-guess the trial court's resolution of a factual dispute by relying on evidence that is either disputed, or that the court could easily have rejected as not credible. Even under the standard we articulated in *In re J.F.C.*, this reweighing of the evidence is improper. *See In re J.F.C.*, 96 S.W.3d 256, 266 (Tex.2002). And in a case like this, where so much turns on the witnesses' credibility and state of mind, appellate factfinding is particularly dangerous.

Neither of the dissents, for example, credits evidence that Duenas understood English. This is important, because the evidence is undisputed that Ciavaglia went over the affidavit with Duenas in English, although he may have paraphrased parts of it. For example, Gonzalez testified that Ciavaglia "went step by step and made sure to—that [Duenas and Inocencio] understood what . they were signing.... Mark [Ciavaglia] explained it in detail. And Ricardo kept on, like he acknowledged what was being said." And Ciavaglia testified that he told Duenas that "[t]his document is very—excuse me—very important. And that by signing it, you're acknowledging that you understand this document and you understand the consequences of this document, and that you fully, finally, and forever give up any parental rights to your children. And you also relinquish your right and give up your right to change your mind." Ciavaglia also testified that he went "through the form and I was explaining it to [Duenas]."

And Duenas's testimony about his ability to understand English was inconsistent; although he testified that he understood *no* English whatsoever, he soon contradicted himself:

ATTORNEY AD LITEM: Mr. Duenas, I'm a little confused as to how much English you understand. Let me go

over some testimony that I think you gave the court a little bit earlier.

When the lawyer told you in English to sign here and initial here, did you tell the Court that you understood that?

DUENAS: Yes, I did understand.

Duenas also submitted a Statement of Paternity in English and swore, in the attached verification, "that he has read the foregoing Statement of Paternity."

Other witnesses testified that Duenas appeared to understand what was transpiring at the affidavit signing:

Q: How did you receive the information from Ricardo Duenas?

CIAVAGLIA: I asked him verbally.

Q: And was he able to understand what you asked him and relay the information?

CIAVAGLIA: He seemed to be. He seemed to understand English and responded to questions.

Q: When you asked for his name, did he respond with his name correct—give you a detail of his name, or did he write it out? How did he do it?

CIAVAGLIA: He pronounced it, and I just wrote it. As I wrote his last name, I spelled it out loud; and he acknowledged that was correct.

And Gonzalez testified that after Duenas signed the affidavit, she told him in English, "Thank you. What you are doing is very courageous." She then asked her mother to translate, but Duenas interrupted and told the mother it was unnecessary. Moreover, there was evidence that Duenas had been working four years for a chef who spoke only English. Although Duenas testified that a coworker translated the chef's directions, the trial court may have found Duenas's self-contradicted testimony that he understood no English af-

ter four years in this environment not credible. The trial court may also have found Duenas not credible because he testified that none of the affidavit had been translated for him, when every other witness testified that at least some portions of the affidavit were translated. In any event, the trial court had the opportunity to observe Duenas's responses and demeanor; second-guessing the trial court's factfinding in these circumstances is unwarranted and ill-advised.

### B.

Moreover, the dissenters' assumption that Duenas's mere biological relationship with the twins afforded him "rights, fundamental and constitutional in their magnitude" is questionable. As we have noted, the trial court found that Duenas was not the twins' presumed father, and that Duenas had no legal relationship with the boys at the time he signed the affidavit. Duenas, a twenty-five-year-old man, admits that he fathered twin sons by a fifteen-year-old child who was incapable of legally consenting to a sexual relationship. Duenas signed the affidavit relinquishing his parental rights more than five months after the boys' birth, while he was living with another woman. Until he filed a counterpetition for paternity in this case (five days before the scheduled termination hearing, almost two months after signing the relinquishment affidavit, and more than seven months after Inocencio gave birth to the twins), Duenas took no steps to establish parental rights. Moreover, Duenas did not request a full translation of the relinquishment affidavit, even though there was nothing to prevent him from doing so and he knew that the proceedings would affect the boys' future. His failure to do so could be interpreted as disinterest. And there is evidence that Duenas contributed little, if

any, to the boys' support and daily care.[1] The record strongly suggests that Inocencio's mother had assumed almost complete responsibility for the twins, and it is undisputed that she had moved to be named their managing conservator. The boys were receiving public assistance through the WIC program, and at one point there was an attempt to obtain child support from Duenas through the attorney general's office.

The Supreme Court has made it abundantly clear that a man's mere biological relationship with a child is insufficient to confer a protected liberty interest upon him. In *Lehr v. Robertson,* the Court explained:

> The difference between the developed parent-child relationship that was implicated in *Stanley*[*v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551] and *Caban,*[*v. Mohammed,* 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297] and the potential relationship involved in *Quilloin* [*v. Walcott,* 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978)] and this case, is both clear and significant. When an unwed father demonstrates a full commitment to the responsibilities of parenthood by "com[ing] forward to participate in the rearing of his child," his interest in personal contact with his child acquires substantial protection under the due process clause. At that point it may be said that he "act[s] as a father toward his children." But the mere existence of a biological link does not merit equivalent constitutional pro-

tection.... "[T]he importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in 'promot[ing] a way of life' through the instruction of children as well as from the fact of blood relationship."

463 U.S. 248, 261, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983) (citations omitted) (emphasis added). In *Lehr,* the Court held that a putative father who had never established a substantial relationship with his child was not entitled to notice of adoption proceedings as a matter of due process.[2] *Id.* at 265, 103 S.Ct. 2985. This Court, too, has long recognized that any constitutional interest a putative father may claim stems from his acceptance of "the legal and moral commitment to the family," not from a mere biological relationship. *In re K.,* 535 S.W.2d 168, 171 (Tex.1976), *cert. denied,* 429 U.S. 907, 97 S.Ct. 273, 50 L.Ed.2d 189 (1976); *see also In re T.E.T.,* 603 S.W.2d 793, 795 (Tex. 1980), *cert. denied sub nom., Oldag v. Catholic Charities of the Diocese of Galveston–Houston,* 450 U.S. 1025, 101 S.Ct. 1732, 68 L.Ed.2d 220 (1981) (holding that statute that imposed different requirements to establish parental rights on father than on mother did not violate father's right to equal protection under the law); *In re J.W.T.,* 872 S.W.2d 189, 195 (Tex.1994) (noting that a father's constitutional "interest does not come into exis-

---

1. Duenas and Inocencio both testified that he contributed to the twins' support, but their testimony about the extent of that support is inconsistent. There is undisputed evidence that, at the affidavit signing, Inocencio stated that Duenas "didn't help her, [she] thought he was a sh* * *y a* * father."

2. The dissenting opinion in *Lehr* reveals that the biological father in that case had aggres-

sively pursued a relationship with the child, but had been thwarted by the child's mother. *Lehr,* 463 U.S. at 268–69, 103 S.Ct. 2985 (WHITE, J., dissenting). Nevertheless, the Court held that the putative father's lack of any substantial relationship with the child weighed against recognizing a constitutional right to notice and hearing.

tence or is soon lost, however, if the father is unable to demonstrate that he is fit and committed to the responsibilities of parenthood [or if the father has not] 'taken concrete actions to grasp his opportunity to be a father' ") (quoting *In re Adoption of B.G.S.*, 556 So.2d 545, 550 (La.1990)).

## V

Because the theories on which Duenas and Inocencio seek to reverse the court of appeals' judgment were never presented in the trial court, they were not preserved for our review. Accordingly, we affirm the court of appeals' judgment.

Justice WAINWRIGHT delivered a concurring opinion.

Justice OWEN delivered a concurring and dissenting opinion, joined by Chief Justice PHILLIPS as to all Parts, and joined by Justice HECHT and Justice JEFFERSON as to Part III.

Justice HECHT delivered a dissenting opinion, in which Justice JEFFERSON joined.

Justice WAINWRIGHT, concurring.

I join the Court in affirming the court of appeals' judgment. However, I join only sections I, II, and IV.A. of Justice O'Neill's writing concerning the judgment on Ricardo Duenas's appeal, and section VII of Justice Owen's writing concerning the judgment on Maria Inocencio's appeal.

The Court today holds that Ricardo Duenas failed to preserve the issue he presented for our review—that the procurement of his affidavit of relinquishment and the subsequent termination of his parental rights constituted a violation of his right to due process under the United States Constitution. Because he failed to preserve the sole issue raised in his petition, determining the burden of proof applicable to his affidavit of relinquishment

of parental rights is unnecessary to resolve his appeal.

I agree that Maria Inocencio preserved for our review the issue that execution of her affidavit of relinquishment was rendered involuntary by the coercion, deception and undue influence by certain individuals, including her sister and the persons seeking to adopt the twins. Accordingly, a legal sufficiency review of the issue Inocencio raises is required, and I agree with the result of Justice Owen's writing on this point.

I write separately to express my concern about another issue in this case. At trial, Inocencio represented to the court that to set the relinquishment affidavit aside, she had the burden of proof by a preponderance of the evidence to show that it was executed as a result of coercion, duress, fraud, deception, undue influence, or overreaching. Some courts of appeals likewise have held that the parent who executed the relinquishment affidavit has the burden to prove by a preponderance of the evidence that it was not executed voluntarily in order to avoid the very serious consequences of its execution. *See, e.g., In re D.R.L.M.*, 84 S.W.3d 281, 296–298 (Tex. App.-Fort Worth 2002, pet. denied); *In re V.R.W.*, 41 S.W.3d 183, 193 (Tex.App.-Houston [14th Dist.] 2001, no pet.); *Coleman v. Smallwood*, 800 S.W.2d 353, 356 (Tex.App.-El Paso 1990, no writ).

Justice Owen, applying a different approach, cites the requirement under the Constitution and the Texas Family Code that the ultimate burden of proof, based on clear and convincing evidence, remains with the party seeking to terminate the parental rights. She recognizes that, absent any other evidence, a trial court could base termination on a relinquishment affidavit. If the burden to disprove the affidavit at trial remains on the parents in this

circumstance, as stated by Inocencio at trial, then the constitutional and statutory requirements would be violated.

I maintain that where a "voluntarily" executed relinquishment affidavit is the sole ground for termination of parental rights under section 161.001(1) of the Family Code, placing the burden on the parents to set aside the affidavit may run afoul of constitutional and statutory mandates for the burden of proof and quantum of evidence necessary to terminate parental rights. This issue was not briefed, nor was it expressly decided in the courts below.

Inocencio's appeal is unsuccessful under either approach. Accordingly, it is not necessary to decide this issue in this case.

Justice OWEN, concurring and dissenting, joined by Chief Justice PHILLIPS, Justice HECHT and Justice JEFFERSON joined in Part III.

I dissent from the judgment terminating Ricardo Duenas's parental rights. Although I agree that Duenas did not raise a due process issue in the trial court, and therefore no due process complaint was preserved for appeal, Duenas's underlying complaint is that there is no clear and convincing, legally sufficient evidence that the affidavit of relinquishment he signed was knowingly and thus voluntarily executed. An affidavit relinquishing parental rights is a waiver of a constitutionally protected, "fundamental liberty interest of natural parents in the care, custody, and management of their child."[1] In that re-

gard, it differs from affidavits commonly used in other civil proceedings, such as affidavits containing factual assertions in support of a motion or brief. As a waiver of a constitutionally protected interest, an affidavit of relinquishment must be a voluntary, knowing, and intelligent act.[2] The United States Supreme Court has held that the Due Process Clause of the Fourteenth Amendment requires that before a state can irrevocably sever the rights of a parent, the evidence of grounds for termination must at least be clear and convincing.[3] Accordingly, when the basis for termination is an affidavit of relinquishment, there must be clear and convincing evidence that the waiver was knowing, intelligent, and voluntary. In the case before us today, there is no clear and convincing, legally sufficient evidence that material parts of the affidavit Duenas signed were disclosed to him and thus that he in actuality swore to and agreed to be bound by the affidavit.

The affidavit that Duenas signed was entirely in English. No one disputes that Duenas, a Honduran citizen, was unable to read English. The evidence is accordingly confined to what was said to Duenas in English and Spanish about the affidavit. There is no evidence, however, that Duenas's command of the spoken English language was such that he understood what was said to him in that language. The Court concludes that the trial court could have surmised that Duenas understood more English than he and others said he could. But a surmise is no evidence at all, much less clear and convincing evidence.[4]

1. *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).

2. *See generally Brady v. United States*, 397 U.S. 742, 748, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970).

3. *Santosky*, 455 U.S. at 747–48, 102 S.Ct. 1388.

4. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex.2002); *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 210 (Tex.2002) (quoting *Browning–Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 927 & n. 3 (Tex.1993) (citing *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex.1983) ("When the evidence offered to prove a vital fact is so weak as to do no more than create a

The Court can point to nothing in the record other than speculation that Duenas was able to comprehend what was said to him in English when he was directed to sign the affidavit.

We are thus left to examine what was said to Duenas in Spanish. The evidence is undisputed that the affidavit of relinquishment was never read to Duenas in Spanish. The grandmother of the children made a short statement to him in Spanish about the purpose of the affidavit. That statement did not apprise him of material provisions of the affidavit.

Duenas's complaint that his affidavit was not knowing and voluntary is a valid one and was preserved. I would therefore reverse the termination of his parental rights. With regard to the mother of the children, Luz Maria Inocencio, I join in this Court's judgment terminating her parental rights, but I do not agree with the reasoning of JUSTICE O'NEILL's concurring opinion.

## I

Ricardo Duenas and Luz Maria Inocencio are the biological parents of twins. When the children were born, Duenas and Inocencio were not married. Inocencio was fifteen, and Duenas was twenty-five. The children and Inocencio lived with her mother when they came home from the hospital. There were familial difficulties, and at some point, Inocencio's mother filed a proceeding with the trial court requesting that she be named managing conservator. While that proceeding was pending, Miles and Monica Montegut became involved with the family and hoped to adopt the twins. In the interest of brevity, I will not repeat the facts set forth in JUSTICE HECHT's dissenting opinion in any detail. I

think it is important to emphasize, however, that the Monteguts, who were the prospective adoptive parents, were the moving force behind this controversy. Neither the State of Texas nor any state entity sought termination of the biological parents' rights. The Monteguts retained an attorney to assist them with the adoption of the children. That attorney arranged for Duenas and Inocencio to come to his office to sign affidavits that purported to relinquish their respective parental rights. However, about a week later, Inocencio sought to revoke her affidavit and forestall any termination or adoption proceedings. Her mother was supportive of these efforts and had not dismissed the proceeding requesting that she be named managing conservator.

In the face of opposition from Inocencio and her mother, the Monteguts nevertheless desired to proceed with adoption efforts and filed suit against Duenas and Inocencio, requesting the trial court to terminate the latters' parental rights. Duenas then sought to revoke or otherwise set aside the affidavit that he had signed and filed a counterclaim seeking to establish his paternity.

The trial court consolidated the Monteguts' suit with the proceeding that had been filed by Inocencio's mother. The affidavits of relinquishment that Duenas and Inocencio had signed stated that they were irrevocable, but only for sixty days. At the end of sixty days, the affidavits were fully revocable. The trial court denied Duenas and Inocencio's motion for a continuance and proceeded with a bench trial in the consolidated proceedings just prior to the expiration of the sixty-day window during which the affidavits were irrevoca-

mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in

legal effect, is no evidence."))).

ble. (The affidavits were signed September 24, 1999, trial occurred on November 22 and 23, 1999, and an order of termination was entered December 16, 1999.)

The trial court terminated Duenas's and Inocencio's parental rights based on the affidavits and appointed the Monteguts managing conservators of the children. Duenas and Inocencio appealed, and the court of appeals affirmed the trial court's order of termination. This Court granted the joint petition for review filed by Duenas and Inocencio.

## II

In deciding this case, it must first be determined what arguments have been made and if they were preserved for appeal. The affidavit that Duenas filed in the trial court in an attempt to revoke the "Affidavit of Relinquishment of Parental Rights" that he had previously signed said, "[t]he Affidavit of Relinquishment was not translated for me. I was told I would go to jail if I did not sign the documents." Unquestionably, much of the trial in this case was devoted to determining the extent to which Duenas was apprised of the contents of the affidavit and the extent to which he understood what he had signed. The trial court's only basis for terminating Duenas's parental rights was the relinquishment affidavit, which the trial court affirmatively found had been "signed voluntarily" and was not procured by fraud, duress, or coercion.

In the court of appeals, Duenas contended for the first time that his due process rights had been violated. In setting forth how he believed those rights had been violated, he explained that it was because the affidavit that he signed was in English, which he could not read, and that it was not translated into Spanish for him either

orally or in writing. His brief in the court of appeals contained a section titled "Scope of Review–Appellate Court Must Look at All Evidence." In that section, the brief said: "This Honorable Appellate Court must sustain Appellants' challenge to the sufficiency of the evidence if this Court finds that the trier of fact could not have reasonably found the termination of Appellants' rights was not [sic] established by clear and convincing evidence." In our recent decision in *In re J.F.C.*, we held that "[i]n a legal sufficiency review, a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." [5] Thus, the basis Duenas articulated for his due process claim was that the evidence was legally insufficient to support a finding that he had properly executed a voluntary affidavit of relinquishment.

Duenas's briefing in this Court does not contain the identical statement regarding "sufficiency of the evidence" that was in his court of appeals' brief. But a fair reading of his brief in this Court shows that his basic complaint underlying and supporting his due process issue is that the evidence was legally insufficient to support the trial court's findings regarding the affidavit. The entire focus of the statement of facts in Duenas's brief is that he does not understand English and that the substance of the affidavit was not translated for him, nor was its substance explained to him in Spanish. He repeats the arguments he made in the court of appeals that the trial court's finding must be based on clear and convincing evidence and that his execution of the affidavit of relinquishment was not knowing and voluntary because its core terms were not translated for him. He asserts that the clear and convincing evi-

---

**5.** 96 S.W.3d at 266.

dence burden of proof "is not lessened by proof of an irrevocable affidavit of relinquishment. In fact, such affidavit being one of the alleged grounds for termination, the affidavit must be established under that burden of proof." He is thus complaining that there was no clear and convincing evidence to support a finding that his affidavit was knowingly and voluntarily executed.

Certainly, Duenas could have more clearly articulated that he was bringing a legal sufficiency challenge in this Court. But his failure to use "magic words" is not fatal. The United States Supreme Court has said in an analogous context:

> A generic reference to the Fourteenth Amendment is not sufficient to preserve a constitutional claim based on an unidentified provision of the Bill of Rights, but in this case the authority cited by petitioner and the manner in which the fundamental right at issue has been described and understood by the Illinois courts make it appropriate to conclude that the constitutional question was sufficiently well presented to the state courts to support our jurisdiction.[6]

Similarly, as JUSTICE HECHT's dissent points out,[7] this Court has long held that points of error (now "issues or points presented for review"[8]) and arguments made in briefs will be liberally construed "to obtain a just, fair and equitable adjudication of the rights of the litigants."[9] We should be particularly careful to avoid dismissing substantive arguments on overly technical procedural grounds when termination of parental rights is at issue.

At least one Texas court of appeals has said in a parental termination case, "[w]e interpret [the biological mother's] appellate attack on the voluntariness of her affidavit as a challenge to the legal sufficiency of the evidence to support the trial court's presumed voluntariness finding."[10] I would similarly hold that Duenas preserved a legal sufficiency challenge in this Court.

To support its holding that error was not preserved, this Court quotes counsel for Duenas and Inocencio when he said, in response to a question at oral argument, that his clients have not contended that the affidavit fails to comply with the Family Code.[11] But counsel's response to the question at oral argument does not amount to a statement, much less an admission, that the legal sufficiency of the evidence supporting the voluntariness of the affidavits is not at issue.

Accordingly, I would decide Duenas's petition based on his complaint that there is no legally sufficient evidence that his execution of the relinquishment affidavit was knowing and thus voluntary.

## III

The trial court's only basis for terminating Duenas's rights was the relinquishment affidavit. A parent who signs such an affidavit is surrendering rights protected by the United States Constitution.[12] The United States Supreme Court has

---

**6.** *Taylor v. Illinois*, 484 U.S. 400, 406 n. 9, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988).

**7.** 119 S.W.3d at 732–33.

**8.** TEX.R.APP. P. 53.2(f), 55.2(f).

**9.** *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex.1989).

**10.** *In re D.R.L.M.*, 84 S.W.3d 281, 297–98 (Tex.App.-Fort Worth 2002, pet. denied).

**11.** 119 S.W.3d at 732–33.

**12.** *See Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re G.M.*, 596 S.W.2d 846, 846 (Tex.1980).

made clear that "[w]aivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." [13] We have likewise recognized that a waiver of constitutional rights must be voluntary, knowing, and intelligent, with full awareness of the legal consequences.[14]

To that end, the Legislature has enacted requirements to ensure that a parent's voluntary relinquishment of his or her rights to a child is indeed voluntary and is done with full knowledge of the rights that are being relinquished and the legal consequences. A trial court may terminate a parent's rights if the court finds by clear and convincing evidence that the parent executed "an unrevoked or irrevocable affidavit of relinquishment of parental rights as provided by this chapter." [15] Among other things, the affidavit must contain "a statement that the parent has been informed of parental rights and duties" and a statement that the relinquishment is revocable, irrevocable, or irrevocable for a stated period of time.[16]

When a trial court is presented with an affidavit that, on its face, meets the requirements of section 161.103, the affidavit itself is prima facie proof that it was knowingly and voluntarily executed. Absent any other evidence, the trial court could base termination on such an affidavit. If a parent challenges the affidavit, the burden to produce evidence shifts to the parent to come forward with evidence that the affidavit was not knowingly and thus voluntarily executed. But the constitutional [17] and statutory [18] requirement that parental rights cannot be terminated unless grounds for termination are established by clear and convincing evidence necessarily means that the ultimate burden of proof based on clear and convincing evidence remains with the party seeking to terminate the parental rights.

There has been some confusion among our courts of appeals about the burden of proof when an affidavit of relinquishment is challenged. The court of appeals in *Neal v. Texas Department of Human Services* correctly recognized that "[b]ecause of the very nature of a *voluntary* relinquishment of parental rights, ... it is implicit in the language of section 15.03 that such an affidavit be executed voluntarily." [19] And the court in that case correctly observed that a reviewing court must apply the clear and convincing standard of proof as part of its review of the evidence to determine whether an affidavit was voluntary:

When the trier of fact is required to make a finding made [sic] by clear and convincing evidence, the court of appeals will sustain an insufficient evidence point of error only if the fact finder could not have reasonably found that the fact was established by clear and convincing evidence.

Having reviewed all of the evidence in the record under the clear and convincing standard of proof, we conclude that the record before us does not contain evidence of that effect and quality.

13. *Brady v. United States*, 397 U.S. 742, 748, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970).

14. *Brown v. McLennan County Children's Protective Servs.*, 627 S.W.2d 390, 393 (Tex.1982).

15. Tex. Fam.Code § 161.001(1)(K).

16. Tex. Fam.Code § 161.103(b)(8)-(9).

17. *Santosky*, 455 U.S. at 769, 102 S.Ct. 1388.

18. Tex. Fam.Code § 161.001.

19. 814 S.W.2d 216, 218 (Tex.App.-San Antonio 1991, writ denied) (emphasis in original) (section 15.03 has been recodified as section 161.103).

From the evidence in the record, we further conclude that the trial court could not have reasonably found by a "firm belief or conviction" that Dianna voluntarily executed the affidavit for relinquishment of parental rights.[20]

Similarly, the court in *B.A.L. v. Edna Gladney Home* reviewed the record evidence of voluntariness based on the clear and convincing evidence standard, recognizing that at all times, the ultimate burden remained on the proponent of the affidavit to prove by clear and convincing evidence that the affidavit was voluntarily executed without duress.[21] The court concluded:

> After reviewing the record of the hearing on the motion for new trial and viewing it in the light of the standards set forth above, we have no trouble in holding that there was clear and convincing evidence to support the judgment of the trial court and the findings of fact necessarily implied to support that judgment. Under this evidence it is obvious, and the trial court was clearly entitled to find, as it did, that appellant signed the relinquishment affidavit voluntarily, intelligently, and knowingly, she was aware that she could keep her baby if she so desired with the full support, financial and otherwise of her own family, and she made her own choice to place the baby for adoption without any undue influence, pressure or overreaching on the part of The Edna Gladney Home.[22]

Other decisions of the courts of appeals, however, have shifted the burden of proof to a parent challenging the affidavit. Those courts have said that once it is proven that a parent signed the affidavit, the parent must prove by a preponderance of the evidence that the affidavit was executed as a result of coercion, duress, fraud, deception, undue influence, or overreaching.[23] The first of these decisions seems to have been *Coleman v. Smallwood*,[24] and the courts of appeals that have followed it have done so without any analysis of why. The decision in *Coleman* relied on *Pattison v. Spratlan*[25] and *Terrell v. Chambers*[26] for its conclusions. The holding in *Pattison* was simply that "[i]n the absence of a statement of facts showing duress, we must presume in support of the judgment that appellant failed to establish her defense of duress."[27] Thus, with no analysis and no comment at all about the burden of proof in a termination case, the court of appeals in *Pattison* labeled "duress" a "defense" in a termination case.

The court in *Terrell* cited *Pattison* for the proposition that the burden of proof is on a parent challenging an affidavit based

---

**20.** *Id.* at 222 (citations omitted).

**21.** 677 S.W.2d 826, 830 (Tex.App.-Fort Worth 1984, writ ref'd n.r.e.).

**22.** *Id.* at 830–31.

**23.** *In re D.R.L.M.*, 84 S.W.3d 281, 296 (Tex. App.-Fort Worth 2002, pet. denied); *In re V.R.W.*, 41 S.W.3d 183, 193 (Tex.App.-Houston [14th Dist.] 2001, no pet.); *Vela v. Marywood*, 17 S.W.3d 750, 758 (Tex.App.-Austin 2000), *pet. denied*, 53 S.W.3d 684 (Tex.2001); *In re Bruno*, 974 S.W.2d 401, 405 (Tex.App.-San Antonio 1998, no pet.); *Coleman v.*

*Smallwood*, 800 S.W.2d 353, 356 (Tex.App.-El Paso 1990, no writ).

**24.** 800 S.W.2d at 356.

**25.** 535 S.W.2d 48 (Tex.Civ.App.-Tyler), *aff'd*, 539 S.W.2d 60 (Tex.1976) (modifying judgment to strike assessment of costs against indigent parent).

**26.** 630 S.W.2d 800 (Tex.App.-Tyler), *writ ref'd n.r.e.*, 639 S.W.2d 451 (Tex.1982).

**27.** 535 S.W.2d at 50.

on fraud or misrepresentation.[28] The *Terrell* decision also cited one of this Court's decisions, *Catholic Charities v. Harper*,[29] for the proposition that an "irrevocable affidavit of relinquishment can be revoked only upon a showing of fraud, misrepresentation, over-reaching, or the like." [30] Our decision in *Catholic Charities* was issued twenty years before our decision in *In re G.M.*, in which we held that a court may not terminate parental rights unless it finds there are grounds for doing so by clear and convincing evidence,[31] and more than twenty years before the United States Supreme Court said the same in *Santosky v. Kramer*.[32]

None of the courts of appeals that have shifted the burden of proof to a parent in a termination case have analyzed how that burden shifting comports with the clear and convincing evidence standard the United States Supreme Court has said is mandated by the United States Constitution. And some of those same courts of appeals have exhibited a misunderstanding of the standard of review on appeal when the burden of proof in the trial court was clear and convincing evidence.[33] They instead used the standard of review that applies when the burden of proof is only a preponderance of the evidence and when

the appealing party has the burden of proof in the trial court.[34] Just recently, this Court explained the impact that the clear and convincing evidence requirement has on appellate review.[35]

The clear and convincing evidence requirement necessarily means that the burden of *proof* that an affidavit of relinquishment was voluntarily executed cannot be shifted to a parent. There must be clear and convincing evidence, from the record as a whole, that the affidavit was knowingly and voluntarily executed.[36] Shifting the burden of proof to a parent is in irreconcilable conflict with the clear and convincing standard of proof that the United States Supreme Court has said the federal Constitution requires before parental rights can be terminated [37] and that the Texas Legislature has required in parental termination cases.[38] To illustrate, if a parent produced evidence that made it equally as likely that the affidavit was involuntary as it was that the affidavit was voluntary, the parent would not have carried the preponderance burden of proof that some courts of appeals have imposed. But, a court could not sustain termination on such a record because "a reasonable trier of fact could [not] have formed a firm belief or

28. *Terrell*, 630 S.W.2d at 802.

29. 161 Tex. 21, 337 S.W.2d 111 (1960).

30. *Terrell*, 630 S.W.2d at 802.

31. 596 S.W.2d 846, 847 (Tex.1980).

32. 455 U.S. 745, 769, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).

33. *In re D.R.L.M.*, 84 S.W.3d 281, 297–98 (Tex.App.-Fort Worth 2002, pet. denied); *In re V.R.W.*, 41 S.W.3d 183, 193 (Tex.App.-Houston [14th Dist.] 2001, no pet.); *Vela v. Marywood*, 17 S.W.3d 750, 759–60 (Tex.App.-Austin 2000), *pet. denied*, 53 S.W.3d 684 (Tex. 2001).

34. *In re D.R.L.M*, 84 S.W.3d at 297–98; *In re V.R.W.*, 41 S.W.3d at 193; *Vela*, 17 S.W.3d at 759–60.

35. *See In re J.F.C.*, 96 S.W.3d 256, 263–67 (Tex.2002); *In re C.H.*, 89 S.W.3d 17, 25 (Tex.2002).

36. *See In re J.F.C.*, 96 S.W.3d at 266; *In re C.H.*, 89 S.W.3d at 25.

37. *Santosky*, 455 U.S. at 769, 102 S.Ct. 1388.

38. Tex. Fam.Code § 161.001(1)(K).

conviction that its finding was true." [39]

Some courts of appeals have held that the logical progression of placing the burden of proof on a parent in challenging an affidavit is that on appeal, not only does a parent have to show that there was no evidence to support the trial court's finding that the affidavit was signed knowingly and voluntarily, the parent must also establish *as a matter of law* that the affidavit was not knowingly or voluntarily executed.[40] This is clearly at odds with the constitutional and, in Texas, statutory requirement that a trial court cannot terminate a parent's rights unless it finds grounds to do so from clear and convincing evidence.

The confusion that some courts of appeals have had regarding a parent's burden is shared by Duenas and Inocencio. In their briefing in this Court, they quote from *In re Bruno*,[41] saying that an " 'affidavit may be set aside only upon proof, by a preponderance of the evidence, that the affidavit was executed as a result of coercion....' " [42] However, neither the trial court nor this Court has been led into error by these statements. The transcript of the termination hearing reflects that the trial court was unpersuaded that the parents bore the burden of proving by a preponderance of the evidence that they had not voluntarily signed the affidavits. More importantly, the trial court's order terminating Duenas's and Inocencio's parental rights affirmatively found based on clear and convincing evidence that each parent had executed an affidavit voluntarily. The trial court did not *fail* to find that Duenas's or Inocencio's affidavit was knowing or voluntary, which would have been ap-

propriate if the trial court thought the parents had the burden of proof regarding their affidavits. Nor does the trial court's order or any of its findings mention preponderance of the evidence or otherwise indicate that it placed the burden of proof on Duenas and Inocencio. The trial court correctly concluded that it could not terminate the parents' respective rights unless it found by clear and convincing evidence that they had voluntarily executed an affidavit of relinquishment. This Court should not mislead the bench and bar by applying a different, incorrect burden of proof and consequently an incorrect standard of review on appeal simply because a party's briefing incorrectly states the burden of proof. Nor should we ignore controlling United States Supreme Court precedent. In *Santosky v. Kramer*, the Supreme Court squarely held that in parental termination proceedings, due process requires that the burden of proof be at least clear and convincing evidence because the risk of error from using a preponderance standard is too great:

> Today we hold that the Due Process Clause of the Fourteenth Amendment demands more than this. Before a State may sever completely and irrevocably the rights of parents in their natural child, due process requires that the State support its allegations by at least clear and convincing evidence.

> * * *

> In parental rights termination proceedings, the private interest affected is commanding; the risk of error from using a preponderance standard is substantial; and the countervailing govern-

---

**39.** *In re J.F.C.*, 96 S.W.3d at 266.

**40.** *In re D.R.L.M.*, 84 S.W.3d at 298; *In re V.R.W.*, 41 S.W.3d at 193; *Vela*, 17 S.W.3d at 759–60.

**41.** 974 S.W.2d 401, 405 (Tex.App.-San Antonio 1998, no pet.).

**42.** Petition for Review at 5–6.

mental interest favoring that standard is comparatively slight. Evaluation of the three *Eldridge* factors compels the conclusion that use of a "fair preponderance of the evidence" standard in such proceedings is inconsistent with due process.[43]

The statute under review in *Santosky* permitted a state to terminate a parent's rights upon a finding by a preponderance of the evidence "that the child is 'permanently neglected.'"[44] The Supreme Court did not specifically address termination based on an affidavit of relinquishment. But the Supreme Court's reasoning and holdings were broad, and this Court must follow Supreme Court precedent unless and until the Supreme Court narrows or changes its reasoning and holdings.[45]

To say that a biological parent must prove by a preponderance of the evidence that an affidavit of relinquishment was involuntary not only shifts the burden of proof to the biological parent, it would lead to the incongruous result that a preponderance standard is constitutionally infirm for resolving some factual disputes over whether grounds exist for termination of parental rights, but would be acceptable in determining if other grounds—such as an affidavit signed by a parent—exist. The Supreme Court seems to have foreclosed parsing of this kind when it said in *Santosky*, "this Court never has approved case-by-case determination of the proper *stan-*

*dard of proof* for a given proceeding. Standards of proof, like other 'procedural due process rules[,] are shaped by the risk of error inherent in the truth-finding process as applied to the *generality of cases,* not the rare exceptions.'"[46] The Supreme Court elaborated, explaining that the value society places on the individual liberty at issue dictates the degree of confidence in the correctness of factual conclusions:

> "[T]he standard of proof is a crucial component of legal process, the primary function of which is 'to minimize the risk of erroneous decisions.'" Notice, summons, right to counsel, rules of evidence, and evidentiary hearings are all procedures to place information *before* the factfinder. But only the standard of proof "instruct[s] the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions" he draws from that information. The statutory provision of right to counsel and multiple hearings before termination cannot suffice to protect a natural parent's fundamental liberty interests if the State is willing to tolerate undue uncertainty in the determination of the dispositive facts.[47]

The Supreme Court concluded: "Thus, at a parental rights termination proceeding, a near-equal allocation of risk between the parents and the State is constitutional-

---

**43.** 455 U.S. 745, 747–48, 758, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1989) (discussing *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)).

**44.** *Id.* at 747, 102 S.Ct. 1388.

**45.** *See generally Rodriguez de Quijas v. Shearson/Am. Express, Inc.,* 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the

Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."); *Barnett v. Barnett,* 67 S.W.3d 107, 124 (Tex. 2001); *Owens Corning v. Carter,* 997 S.W.2d 560, 571 (Tex.1999).

**46.** *Santosky,* 455 U.S. at 757, 102 S.Ct. 1388 (emphasis and alterations in original) (quoting *Mathews,* 424 U.S. at 344, 96 S.Ct. 893).

**47.** *Id.* at 757 n. 9, 102 S.Ct. 1388 (emphasis in original and citations omitted).

ly intolerable." [48] Any *parens patriae* interest a state may have in terminating a biological parent's rights arises only after grounds for terminating that parent's rights have been found in a court of law to exist.[49] Accordingly, the Supreme Court explained, the "State's interest in finding the child an alternative permanent home arises only 'when it is *clear* that the natural parent cannot or will not provide a normal family home for the child.'" [50] The Supreme Court continued: "At the fact-finding, that goal is served by procedures that promote an accurate determination of whether the natural parents can and will provide a normal home." [51] This reasoning applies with equal force when an affidavit of relinquishment is the evidentiary basis for finding that the parent will not provide a home for the child. There must be *clear* evidence that the affidavit was a knowing and voluntary statement that the parent has chosen to relinquish all responsibility and rights regarding the child.

The Supreme Court also expressly rejected the idea that a child's interest in stability might outweigh the interests of a biological parent. The *Santosky* decision held that a state court's suggestion "that a preponderance standard properly allocate[d] the risk of error *between* the parents and the child ... is fundamentally

mistaken." [52] The Court reiterated in that decision, "we cannot agree ... that a preponderance standard fairly distributes the risk of error between parent and child." [53] The Court said, "the parents and the child share an interest in avoiding erroneous termination." [54] The state court's rationale for using a preponderance of the evidence standard "reflect[ed] the judgment that society is nearly neutral between erroneous termination of parental rights and erroneous failure to terminate those rights." [55] The Supreme Court soundly rejected this assessment of a parent's and child's respective interests.[56]

The Supreme Court reasoned that the consequences for an erroneous termination are more severe for a parent than a child:

> For the child, the likely consequence of an erroneous failure to terminate is preservation of an uneasy status quo. For the natural parents, however, the consequence of an erroneous termination is the unnecessary destruction of their natural family. A standard that allocates the risk of error nearly equally between those two outcomes does not reflect properly their relative severity.[57]

The Supreme Court has also clearly indicated that any interest of prospective adoptive parents does not change this analysis.[58] Accordingly, in determining

---

**48.** *Id.* at 768, 102 S.Ct. 1388.

**49.** *Id.* at 767 n. 17, 102 S.Ct. 1388 ("Any *parens patriae* interest in terminating the natural parents' rights arises only at the dispositional phase, *after* the parents have been found unfit." (Emphasis in original)).

**50.** *Id.* at 767, 102 S.Ct. 1388 (emphasis in original) (quoting N.Y. Soc. Serv. Law § 384 b.1.(a)(iv)).

**51.** *Id.*

**52.** *Id.* at 765 (emphasis in original).

**53.** *Id.*

**54.** *Id.*

**55.** *Id.*

**56.** *Id.*

**57.** *Id.* at 765–66, 102 S.Ct. 1388.

**58.** *Id.* at 754 n. 7, 102 S.Ct. 1388 ("The fact that important liberty interests of the child and its foster parents may also be affected by a permanent neglect proceeding does not justify denying the *natural parents* constitutionally adequate procedures." (Emphasis in original)).

whether grounds for termination exist, to which the Supreme Court referred as the "factfinding" stage,[59] the vital interest in preventing erroneous termination requires a clear and convincing standard: "But until the State proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of their natural relationship. Thus, at the factfinding, the interests of the child and his natural parents coincide to favor use of error-reducing procedures."[60]

In the case before us today, the children and their parents likewise share a vital interest in preventing erroneous termination. The error-reducing procedure required by the United States Supreme Court in *Santosky* and by the Texas Legislature in Family Code section 161.001(1)(K) is that a court may not terminate a parent's rights unless it finds grounds for termination by clear and convincing evidence. The sole ground for termination in this case is the execution of affidavits of relinquishment. Unless and until there is clear and convincing evidence that an affidavit was indeed knowing and voluntary, termination cannot lawfully occur.

Once again, I do not suggest that an affidavit that appears on its face to have been properly executed cannot constitute clear and convincing evidence when there is no challenge to the affidavit. But when there is evidence that the affidavit was not voluntary, all the evidence must be considered to determine whether there is clear and convincing evidence that it was voluntary.

## IV

In this case, Duenas presented evidence that he could not read the affidavit, that his command of the English language was very minimal, and that critical provisions were not translated for him into Spanish. In the face of this evidence, what clear and convincing evidence was there from which the trial court could have found that Duenas knowingly and intelligently surrendered his parental rights with sufficient awareness of the relevant circumstances and the likely consequences?[61] Section 161.103 of the Texas Family Code requires that an affidavit of relinquishment state that the parent has been informed of parental rights and duties and whether the affidavit is revocable, irrevocable, or irrevocable for a stated period of time.[62] What clear and convincing evidence is there that Duenas was apprised of these matters and then voluntarily relinquished all parental rights?

The decision in *Queen v. Goeddertz,*[63] cited by Duenas in his briefing in this Court, is instructive. In that case, a father executed an affidavit relinquishing his parental rights so that his wife's new husband could adopt the child. In two places on the affidavit, handwritten additions had been inserted that said the relinquishment was subject to the biological father's understanding that he would have the right to visit the child each month.[64] The court

**59.** *Id.* at 760, 102 S.Ct. 1388 ("At the factfinding, the State cannot presume that a child and his parents are adversaries. After the State has established parental unfitness at that initial proceeding, the court may assume at the *dispositional* stage that the interests of the child and the natural parents do diverge." (Emphasis in original)).

**60.** *Id.* at 760–61, 102 S.Ct. 1388.

**61.** *See Brady v. United States,* 397 U.S. 742, 748, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970).

**62.** Tex. Fam.Code § 161.103(b)(8)-(9).

**63.** 48 S.W.3d 928 (Tex.App.-Beaumont 2001, no pet.).

**64.** *Id.* at 929–30.

of appeals held that this provision was unenforceable and that the voluntariness of the affidavit was thereby negated.[65]

In this case, as can be seen from the evidence, Duenas understood that "he wasn't going to be the father anymore." But that is not the same as an understanding that he would no longer be able to visit or telephone his children, or take them to a ball game, or attend school functions, or indeed, see them again. Furthermore, it is undisputed that Duenas was never told that the affidavit was irrevocable for sixty days and that during that time, his children could be adopted by people he did not know and that all ties he had with the children would be severed.

Because the Court characterizes the evidence surrounding Duenas's execution of his affidavit, I think it is helpful to look at the evidence itself, as JUSTICE HECHT's dissent has done. The Court says that the trial court could have made its own determination about the extent to which Duenas understood English in spite of the *undisputed* testimony that Duenas's command of the English language was extremely limited. The Court's reasoning is directly contrary to our precedent. At most, the trial court could have had a suspicion about the extent of Duenas's proficiency in the English language. But that is not legally sufficient evidence, particularly when the burden of proof is clear and convincing evidence.[66] Esther Gonzalez, who is Inocencio's sister and who was largely responsible for arranging the adoptions, said unequivocally and without contradiction, "I am not fluent in Spanish, so I cannot communicate with him [Duenas].... So, if anything, it would have to be told to him. My mother and my sister would have to be

the ones." Gonzalez also stated, "I have not had any communication with Ricardo [Duenas] one on one because I cannot converse fluently in Spanish."

A paralegal for the Monteguts' attorney understood some Spanish, and she witnessed all the events when the affidavits were signed. She testified that throughout the process, Duenas: "Never said a word." With regard to what was actually translated for Duenas, the paralegal testified that Inocencio's mother only told Duenas:

- "That he was giving up his rights of the children, and that he will no longer be responsible for them. And that once this is all through, that's it, you know."

- "She's just saying that his father-he wasn't going to be the father anymore, that he's giving up his rights. That's what she was telling him."

- Q. "So did she tell him whether or not he would have an opportunity to change his mind later?"

  A. "No, she didn't."

As JUSTICE HECHT's dissent points out,[67] when various witnesses say that Duenas "understood," they could not have meant that Duenas understood all of what was contained in the seven-page, single-spaced document that no one translated for him. The extensive contents of the affidavit are set forth verbatim in JUSTICE HECHT's dissent.

The Court notes that Duenas submitted a Statement of Paternity to the trial court in which the verification said that Duenas had "read the Statement of Paternity."[68] But there is no contention by any of the parties, much less evidence, that this

---

65. *Id.* at 932.

66. *See supra* note 1.

67. 119 S.W.3d at 730.

68. 119 S.W.3d at 712–13.

Statement was not translated into Spanish for Duenas.

The record contains no clear and convincing evidence that Duenas understood that by signing the Affidavit of Relinquishment put before him, his children could be adopted by strangers and he could never again have any contact with them. To the contrary, the evidence is overwhelming that Duenas was never told in Spanish, the only language he could speak or read, about material aspects of the affidavit he was signing.

## V

A word in response to the suggestion in JUSTICE O'NEILL's concurring opinion that Duenas waived his constitutional rights as a parent by failing to maintain a closer relationship with the twins is in order. The trial court found that "[t]he legal parent-child relationship between [Duenas] and the children did not exist at the time of the signing of the Father's Affidavit of Relinquishment of Parental Rights." That is not a finding that a legal parent-child relationship did not exist thereafter. The trial court's same findings reflect that Duenas filed a Statement of Paternity, which was executed *after* he signed the relinquishment affidavit. The record is also clear that Duenas was attempting to set aside the relinquishment affidavit. The trial court further found that by the time of trial, Duenas and Inocencio had married one another. There is also evidence that Duenas had some relationship with his children. He took them to receive medical care and provided some monetary support, although there is conflicting evidence as to the amount and extent of that support. But no one has ever suggested, and there is no basis for suggesting, that Duenas is not the father of the children or that he waived his parental rights by fail-

ing to establish a closer relationship with his children.

## VI

As additional grounds for terminating Duenas's parental rights, the Monteguts alleged in their petition in the trial court that Duenas had actually or constructively abandoned the children. The Monteguts did not request the trial court to make any findings of fact or conclusions of law regarding these claims, and the trial court made none. The trial court's judgment as to Duenas was based only on his affidavit of relinquishment. The Monteguts have not argued in the trial court, the court of appeals, or this Court that the trial court should have based its judgment on additional or alternative grounds. Accordingly, there are no further issues to be resolved by the trial court in the current suit to terminate Duenas's parental rights.

## VII

I agree that the order terminating Inocencio's parental rights should be upheld, but I disagree with JUSTICE O'NEILL's concurring opinion that none of Inocencio's arguments were preserved for appeal. Inocencio framed the issue in this Court challenging the voluntariness of her affidavit as follows: "Should the order terminating MARIA's [Inocencio's] parental rights be set aside since MARIA's signature on the affidavit of relinquishment of her parental rights was procured in exchange for 'small kindnesses' and unenforceable promises which constitute undue influence or overreaching as a matter of law?" She argues in her brief that Detective Goetschius, a policeman who was also the Monteguts' brother-in-law, first came into contact with her when she had "been in trouble with the law for dancing at a strip club while underage." She states that she met Detective Goetschius when

he was "taking her statement as part of his official investigation of her alleged illegal activity." She further asserts in her brief: "His interest in MARIA peaked when he found out that she was pregnant and thereafter he began giving her advice, taking her to doctor's appointments and contacting her mother." She asserts: "No line was ever drawn to distinguish as to when he was acting in his capacity as a police professional ... and when he was acting on behalf of his brother-in-law, [Mr. Montegut]."

Inocencio argues that, as a matter of law, Detective Goetschius's conduct amounted to undue influence or overreaching. It is clear from Inocencio's briefing that she is challenging the legal sufficiency of the evidence that supports the trial court's finding that she voluntarily executed an affidavit of relinquishment and the finding that the affidavit was not procured by fraud, duress, or coercion. For the reasons discussed above in Part III, Inocencio does not have to establish, as a matter of law, that she did not voluntarily sign her affidavit of relinquishment.[69] She must only establish that there was legally insufficient clear and convincing evidence to support the trial court's termination of her parental rights based on the affidavit. Nor did her error of law regarding her burden lead the trial court or this Court into error, as also discussed above in Part III.

Inocencio has not waived or failed to preserve her legal sufficiency challenge. JUSTICE O'NEILL's concurring opinion is mistaken in contending otherwise. A majority of this Court correctly concludes that Inocencio's legal sufficiency challenge should be reviewed on its merits and should not be summarily dismissed. This same majority disagrees over whether her arguments carry the day when they are analyzed on their merits. However, a different majority of the Court affirms the court of appeals' judgment with regard to Inocencio, albeit for differing reasons.

I conclude that Inocencio's legal sufficiency challenge should not be sustained. The evidence regarding Detective Goetschius's "small kindnesses" toward Inocencio and his influence on her is disputed, but a reasonable trier of fact could have formed a firm belief that they did not induce or unduly influence Inocencio to sign her affidavit. There was testimony that after Detective Goetschius discovered Inocencio was pregnant, he took her to doctors' appointments and asked how her pregnancy was going. Inocencio's mother said that when Goetschius first learned Inocencio was pregnant, he asked both of them whether they had thought of adoption and said he knew people with money who would want the baby. Both Inocencio and Goetschius, however, testified that they once spoke generally about adoption and that Goetschius told her he had adopted one of his children and it had been a good experience, but that he never counseled her to give her baby up for adoption. Goetschius was not present when the affidavit was executed. In reviewing this evidence, the trial court could reasonably have formed the firm belief that Goetschius's contact with Inocencio during her pregnancy and their single general discussion of adoption did not influence Inocencio to sign the affidavit.

Inocencio also argues in this Court that Detective Goetschius and Mark Ciavaglia, the Monteguts' attorney for the adoption proceedings, violated section 162.025 of the Texas Family Code [70] by acting as intermediaries in a private adoption without

---

**69.** *See supra* Part III.

**70.** TEX. FAM.CODE § 162.025.

being licensed in accordance with Chapter 42 of the Texas Human Resources Code.[71] There was testimony at the trial that neither Children's Protective Services nor a private adoption agency was involved in any way in the Monteguts' attempted adoption of the twins. But there is no evidence that the absence of a licensed adoption agency influenced Inocencio's decision to sign her affidavit of relinquishment.

More troubling is Inocencio's argument that she only agreed to sign her affidavit after the Monteguts made promises in writing to send her updates and photographs of the children periodically and to allow her to give gifts to the children through Ciavaglia. Inocencio now contends that those promises are unenforceable, and that because she conditioned her execution of the affidavit on those promises, she was fraudulently induced to sign the affidavit. However, Inocencio never argued in the trial court that the agreement was unenforceable. Further, the Monteguts have never taken the position that the agreement is unenforceable or that they do not intend to honor it. Inocencio never asked the trial court to include any sort of finding about the enforceability of the agreement in the termination order. Nor did she request the trial court to include in the order a directive that the Monteguts were to provide her periodically with pictures and an update. In fact, when the Monteguts' attorney first questioned Inocencio about the agreement to send pictures and updates, her own attorney objected to the subject, stating, "I don't really see that it's relevant to the issue of fraud and duress." The trial court was never asked to rule on whether the Monteguts' promises were enforceable or

whether, if unenforceable, Inocencio's affidavit was procured by fraud, duress or coercion. Inocencio cannot now ask this Court to resolve that issue.

The trial court could reasonably have formed a firm belief or conviction that Inocencio voluntarily executed the affidavit of relinquishment.[72] Inocencio clearly understood what she was signing and was aware of the likely consequences of executing the affidavit. Viewing the evidence in the light most favorable to the trial court's findings, I would hold that there is legally sufficient, clear and convincing evidence to support the trial court's finding that Inocencio's execution of her affidavit of relinquishment was voluntary and not the result of fraud, duress, or coercion. Accordingly, I concur in the judgment with regard to Inocencio.

\*     \*     \*     \*     \*     \*

For the foregoing reasons, I concur that the court of appeals' judgment should be affirmed as to Inocencio. But I dissent from the judgment that terminates Duenas's parental rights.

Justice HECHT, joined by Justice JEFFERSON, dissenting.

"[T]his case," laments the Court, "has taken its excruciatingly slow course through our judicial system." [1] Lamentably, a little more than a third of the excruciation has been *in this Court.* And just whose fault is *that?* Whose fault is it that *this Court* has taken 524 days to decide this case? Why, the parties', of course, says the Court. Who else could be to blame? Not us. We've tried our very best, but "appellate review has been greatly hampered by the shifting, indistinct fo-

---

**71.** Tex. Hum. Res.Code § 42.001 *et seq.*

**72.** *See In re J.F.C.,* 96 S.W.3d 256, 266 (Tex. 2002).

**1.** *Ante* at 708–09.

cus of their complaints".[2] Well, well. The facts here are a bit of a problem. We decided six parental rights termination cases last Term,[3] and took, respectively, 199 days,[4] 361 days,[5] 387 days,[6] 540 days,[7] 584 days,[8] and 646 days[9] to issue an opinion in each. In none of the three cases that the Court took a week, eight weeks, and seventeen weeks longer to decide than it took to decide this case was "appellate review ... greatly hampered" by poor briefing.

"[W]e still disagree about what the complaints are and whether they were preserved", the Court moans.[10] And here again, the fault for our disagreement must in all fairness be laid squarely at the parties' feet. If only the briefing had been better, the Court's decision would have been prompt and unanimous. But before taking the Court's word for this, the reader may wish to know that the parties have filed about 88 pages of briefs and motions in this Court, the reporter's record of the one-day hearing in the trial court is 328 pages, and the clerk's record is 117 pages. All told, the record and briefs would not take any one of our law clerks more than half a day to master. Truth is, the Court knew what the issues were in this case from the time it was filed. What the Court has disagreed about for more than a year is not what the issues are, but whether these parents' rights in their children

can be terminated some technical way without having to address their arguments.

Then in what I believe must rank as among the most bizarre statements to be found in an opinion from this Court, the Court says that what it is really trying to do in this case is: *discourage foreign adoptions*. This, the Court warns, is a mounting plague on our society, and for proof one need look no further than a story in last month's *Miami Herald*. Thank goodness this case, poorly briefed and all, came along when it did, and that we delayed our decision until the *Miami Herald's* exposé. If we hadn't turned these parents away for poor briefing, no telling where adoptive parents would have had to go for "simpler and less expensive"[11] procedures in the future.

The Court says that this case is about appellate procedure. You can't argue on appeal what you don't raise in the trial court. Pure and simple. Happens all the time. Too bad, really. Especially when children are at stake. The Court is certainly not unsympathetic to parents who claim that they have been unjustly deprived of their children. Absolutely not. Just can't be helped, that's all.

With respect, and all nonsense aside, this case is not about appellate procedure or delay. It is certainly not about discouraging foreign adoptions. It is about the process for taking children from their parents, and it is about the Texas legal sys-

---

2. *Ante* at 708–09.

3. *In re A.V.,* 2003 WL 21978114 (Tex.2003); *In the Interest of B.L.D.,* 113 S.W.3d 340 (Tex.2003); *In the Interest of M.S.,* 115 S.W.3d 534 (Tex.2003); *In the Interest of A.F.,* 113 S.W.3d 363 (Tex.2003) (per curiam); *In the Interest of K.N.R.,* 113 S.W.3d 365 (Tex. 2003) (per curiam); *In the Interest of J.F.C.,* 96 S.W.3d 256 (Tex.2002).

4. *A.F.,* 113 S.W.3d 363.

5. *K.N.R.,* 113 S.W.3d 365.

6. *M.S.,* 115 S.W.3d 534.

7. *J.F.C.,* 96 S.W.3d 256.

8. *B.L.D.,* 113 S.W.3d 340.

9. *A.V.,* 2003 WL 21978114.

10. *Ante* at 708–09.

11. *Ante* at 708–09.

tem's treatment of people who do not speak English.

Ricardo Duenas is Hispanic. His native tongue is Spanish. He was at work in a hotel kitchen one day when he was called and told to go immediately to the office of a lawyer he had never met, who as it turned out had been hired by a couple who wanted to adopt Ricardo's five-month-old twin sons. There he was handed a seven-page, single-spaced affidavit, written in English, and told to sign it. He complied, although it took him two tries to get it right. He was told to initial every line of part of the affidavit, and he did. He initialed this sentence, written in boldface, capital letters:

**I REALIZE THAT I SHOULD SIGN THIS AFFIDAVIT OF RELINQUISHMENT IF I AM NOT THINKING CLEARLY BECAUSE OF ILLNESS, MEDICATION, MY EMOTIONAL STATE, OR ANY OTHER REASON.**

Apparently a "not" was left out. The affidavit was not read to him in English or Spanish. Parts of it were paraphrased to him briefly in Spanish. He understood it had something to do with losing his sons.

Ricardo contends that he cannot be said to have voluntarily relinquished all rights to his twin sons by signing an affidavit written in English that he could not understand and that was not translated for him. This was his position in the trial court and the focus of the evidence at the one-day hearing (with an interpreter present, appointed by the court); it was his position in the court of appeals, was thoroughly briefed by all parties there, and was decided by that court on its merits;[12] it is still his position here. His lawyer on appeal has called the termination of his parental rights a violation of constitutional due process; his lawyer in the trial court did not use those exact words. Based on this relatively minor discrepancy and nothing else, the Court refuses to consider Ricardo's position. His trial lawyer could have been more specific, even though she had only two days to prepare, and the appellate lawyer could have elaborated in briefs and argument. But still there cannot be the slightest doubt what Ricardo's complaint is: he lost his five-month-old sons because he does not speak English.

Nor can there be any doubt what his wife Luz Maria Sylvestre Inocencio's complaint is. She contends that in signing her affidavit of relinquishment she was unduly influenced by the kindness of some of the participants in the process and defrauded by promises that her sons' adoptive parents would send her pictures and update her on their progress. This was her position in the trial court; it was her argument in the court of appeals, was briefed by the parties, and was decided by that court;[13] it is still her argument here. For the same technical reasons, the Court refuses to consider whether Maria is right. Again, her appointed guardian ad litem at trial and her appellate counsel (who also represents Ricardo) might have been clearer, but there is still no mistaking Maria's claim.

To miss the simple arguments these parents make, one would seemingly have to

**12.** 117 S.W.3d 1, 4 (Tex.App.-Houston [14th Dist.]) ("Ricardo claims that because he does not understand English, he did not understand what he was signing.... We disagree.").

**13.** *Id.* at 4 ("Appellants contend that Detective Goetschius engaged in coercion and over-

reaching to compel Luz to sign the affidavit. Appellants further contend that the Monteguts' defrauded Luz by agreeing to her demands that she be given semi-annual updates and photographs of the twins. We reject both contentions.").

understand as little English as Ricardo does. Yet the Court takes an extremely restrictive view of Ricardo and Maria's brief, reading it to raise only narrow issues that were not ruled on by the trial court. The termination of parental rights, fundamental and constitutional in their magnitude, is thus held to turn on trifling points regarding the construction of appellate briefs. It has long been "our practice to liberally construe [briefs] in order to obtain a just, fair and equitable adjudication of the rights of the litigants," [14] and our rules mandate this practice.[15] The Court does not follow the practice in this case, where the importance of the rights asserted make it all the more essential. It is fair to say that Ricardo did not make a due process argument to the trial court, but it is not fair to say that his brief, liberally read, makes no broader argument, or that a "just, fair and equitable adjudication" of his parental rights can be made if the core complaint he has made since he was sued is ignored. The same is true for Maria.

To order that children be taken from their parents and given to others is a grave responsibility. To do it solely for technical reasons of appellate procedure, without regard for the parents' arguments, is hard to justify. But to terminate parental rights as the Court does today, based solely on a rigid reading of a brief, is in my view indefensible. I would decide the case on the merits, not on procedure, and would reverse and remand to the trial court for further proceedings.

Accordingly, I dissent.

## I

The Court's summary of the record is as crabbed as its reading of petitioners' brief. From the Court's opinion, it is impossible even to begin to appreciate the context in which the important issues in this case arise. According to the record, here is what happened. Some events are disputed, as I will indicate, but many are not.

### A

In April 1999, Luz Maria Sylvestre Inocencio, age 15, gave birth to twin boys. She contends that Ricardo Duenas, age 25, was their father, and he admits he was. Ricardo and Maria were not married until later in the year. Detective Brian Goetschius had investigated a report that a minor—Maria, as it turned out—had been dancing at a strip joint,[16] and when he

**14.** *Holley v. Watts,* 629 S.W.2d 694, 696 (Tex. 1982); *accord Texas Mexican Ry. v. Bouchet,* 963 S.W.2d 52, 54 (Tex.1998) ("Courts should liberally construe briefing rules."); *Anderson v. Gilbert,* 897 S.W.2d 783, 784 (Tex.1995) ("Courts are to construe rules on briefing liberally."); *Williams v. Khalaf,* 802 S.W.2d 651, 658 (Tex.1990) ("It is our practice to construe points of error liberally in order to adjudicate justly, fairly and equitably the rights of the litigants. We have a policy of 'permitting broader points of error,' 'liberally construing briefing rules,' and relaxing the 'past rigorous requirements as to the wording of points of error' in order to do justice." (citations omitted)); *Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 (Tex.1989) ("[I]t is our practice to construe liberally points of error in order to obtain a just, fair and equitable adjudication of the rights of the liti-gants."); *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 632–633 (Tex.1986) ("We look not only at the wording of the points of error, but to the argument under each point to determine as best we can the intent of the party.").

**15.** Tex.R.App. P. 55.2(f) ("The statement of an issue or point will be treated as covering every subsidiary question that is fairly included.").

**16.** *See* Tex. Penal Code § 43.251(b) ("A person commits an offense if the person employs, authorizes, or induces a child to work: (1) in a sexually oriented commercial activity; or (2) in any place of business permitting, requesting, or requiring a child to work nude or topless.").

learned she was pregnant, he and his wife, Dawnell, took a personal interest in her. Maria's older sister, Esther Gonzalez, age 33, a college graduate, deplored Maria's lifestyle and decided that Maria could not care for her sons properly. Maria and the boys were staying with Esther and Maria's mother, Guillerma Pruitt, and on September 2, 1999, Guillerma petitioned to be named their sole managing conservator, apparently with Maria's agreement. Nevertheless, on September 21, Esther called Detective Goetschius to ask for help in placing the twins for adoption. A day or so later, the Goetschiuses told Esther that Dawnell's sister and brother-in-law, Monica and Miles Montegut, would be willing to adopt Maria's boys.

On September 24, Esther went to Guillerma's home and announced that she had "great news": she had arranged for Maria to give her sons up for adoption that very day. This was certainly news to Maria, since this was the first Esther had mentioned it, but it was not "great" news, and Maria furiously refused to give up her sons. Maria says that she and Esther fought. Esther says Maria was emotional at first but soon calmed down and saw that adoption was best for her boys. Maria and Guillerma say that Esther threatened Maria with juvenile proceedings for having danced nude as a minor if she did not cooperate. Guillerma says that Esther threatened her with truancy proceedings for not having kept Maria in school. Guillerma says that she and Maria feared what would happen to them if they resisted the adoption, and that she and Maria were like "caged animals", "like sheep to the slaughter". Esther maintains that she threatened no one and that calm reason simply prevailed over all. In any event, Maria agreed to go to a lawyer's office in Texas City within the hour and surrender her children. Esther told her that it would be necessary for Ricardo to agree as well, so on the way they stopped at a gasoline station, and Maria telephoned Ricardo at work in Galveston and demanded that he join her. She angrily told him that losing the twins was all his fault.

Ricardo, a native of Honduras with temporary residence in the United States, was working as a cook at a hotel restaurant. He speaks and understands a little English, but there is no evidence that he can read or write English; Spanish is his language. He first heard of the proposed adoption when Maria called him at work on September 24 and demanded that he leave immediately and accompany her to a lawyer's office. He says, and Maria and Guillerma agree, that he was told that if he failed to cooperate he would be prosecuted for statutory rape.[17] Esther and others present at the lawyer's office deny that any threats were ever made. Ricardo rode with Maria to the lawyer's office, where they met Guillerma and Maria's brother, Solomon.

The lawyer, Mark Ciavaglia, had been retained by Miles Montegut earlier in the week. Ciavaglia had been in court the morning of September 24, and upon his return to his office he was met with messages from Miles and Esther insisting that adoption papers be signed that day. He drew up the papers while Ricardo, Maria, Esther, Solomon, Guillerma, and the babies waited in his office.

---

17. *See* TEX. PEN.CODE § 22.011(a) ("A person commits an offense if the person . . . (2) intentionally or knowingly: (A) causes the penetration of the . . . female sexual organ of a child . . . ."); § 22.011(c) ("In this section: (1) 'Child' means a person younger than 17 years of age who is not the spouse of the actor. (2) 'Spouse' means a person who is legally married to another.").

Ciavaglia prepared an affidavit entitled "Father's Affidavit of Relinquishment of Parental Rights" for Ricardo to sign. How much Ricardo understood of the seven-page, single-spaced affidavit is vigorously disputed. The affidavit was not read to Ricardo in English or Spanish, but Ciavaglia paraphrased parts of it briefly and asked Guillerma to translate for Ricardo. Ciavaglia's paralegal, who understood some Spanish but could not speak it, testified that Guillerma told Ricardo that by signing the affidavit he was giving up his rights to his children but did not tell him he could not change his mind later. Guillerma testified that all she told Ricardo was to sign the affidavit. There is no evidence that Ricardo was able to read the affidavit or that he did read it. He signed it and initialed several sentences, one of which stated, apparently incorrectly (or perhaps not):

I realize that I *should* sign this affidavit of relinquishment if I am not thinking clearly because of illness, medication, my emotional state, or any other reason.

(Emphasis added.)

Ciavaglia then attempted to obtain Maria's signature on an identical affidavit. At first she refused, but Ciavaglia offered to have the prospective adoptive parents agree that they would provide her periodic reports and pictures of the boys and would allow her to give them gifts. At that point Maria relented, and when Ciavaglia had discussed the matter with his clients, the Monteguts, and reduced the promise to writing, Maria signed the affidavit.

### B

On October 1, a week after the affidavits were signed, the Monteguts sued Ricardo and Maria to terminate their parental rights. The trial court issued an *ex parte* order temporarily giving the Monteguts custody of the boys. On October 22, the court appointed a guardian ad litem for Maria because she was a minor. The record does not reflect that the guardian filed an answer for Maria.

On November 15, trial was set for a week later, on November 22. On November 17, Ricardo filed an original answer in which he acknowledged paternity. Attached to the answer was his verified "Revocation of Affidavit", in which he stated: "The Affidavit of Relinquishment was not translated for me." Ricardo's attorney reiterated this statement in a motion for continuance filed the day the case was called for trial. At a hearing on the motion the same day, counsel told the trial court:

My basic meritorious defense aside from [having only six days to prepare for trial] is the fact that my client speaks no English, was not translated the affidavit of relinquishment. He was basically picked up at his place of employment [in Galveston], taken to a law office in Texas City, and told if you don't sign this document, the detective will take you to prison and that was all that was told to him. They did not translate the affidavit word for word or line for line. The attorney involved in that case was Mark Ciavaglia of Texas City. The translation was—of that comment was done by Esther Gonzalez who's the older sister of Maria Inocencio, the minor mother in this case, and the minor mother also said the detective is outside and they're going to take you to jail if you don't sign this document. But it was never translated to him as to what the document meant as far as relinquishing his parental rights. Due to other people at work telling him that that was probably not constitutional and not right, they looked around for an attorney and he finally did hire me.

Counsel for the Monteguts urged the trial court to try the case immediately because the affidavits of relinquishment would expire the next day, the sixtieth day after they were signed.[18] The court denied the motion for continuance and immediately proceeded to trial.

Ricardo's counsel requested the presence of a court interpreter to translate the proceedings into Spanish, and the court attempted to locate one. When a suitable interpreter could not be found on such short notice, the court recessed the trial until the morning of November 23.

A principal focus of the brief trial was on whether Ricardo could understand English and what he knew of the affidavit he signed. There was also testimony about the promise the Monteguts made to persuade Maria to sign her affidavit. At the close of the evidence, the court ruled from the bench that Maria and Ricardo had signed their affidavits voluntarily and without duress. The court immediately heard evidence on whether termination of the parents' relationship was in the children's best interest, and after a few minutes of testimony from Miles Montegut, concluded that it was. The court then rendered judgment orally terminating Maria's and Ricardo's relationship with their sons. The judgment signed December 16 recited:

> Luz Maria Inocencio presented issues of fraud, duress, and overreaching to the Court to deny that her Mother's Affidavit of Relinquishment of Parental Rights was signed voluntarily.
>
> Ricardo Duenas present [sic] issues of fraud, duress, and overreaching to the Court to deny that his Father's Affidavit of Relinquishment of Parental Rights was signed voluntarily.
>
> The Court found after hearing the evidence that Luz Maria Inocencio exe-

cuted her Mother's Affidavit of Relinquishment of Parental Rights voluntarily and was not influenced by fraud, duress, or overreaching.

> The Court found after hearing the evidence that Ricardo Duenas executed his Father's Affidavit of Relinquishment of Parental Rights voluntarily and was not influenced by fraud, duress, or overreaching.

Findings made January 21, 2000, echoed the judgment, adding that Ricardo and Maria had married:

> Luz Maria Duenas' signing of the Mother's Affidavit of Relinquishment of Parental Rights was voluntary, and not secured by fraud, duress, or coercion.

* * *

> Antonio Duenas' signing of the Father's Affidavit of Relinquishment of Parental Rights was voluntary, and not secured by fraud, duress, or coercion.
>
> The Court finds that Luz Maria Duenas and Antonio Duenas have married after the signing of their Affidavits of Relinquishment of Parental Rights.

Ricardo and Maria filed no post-trial motions.

## II

### A

I agree with the Court that Ricardo did not raise in the trial court a claim that his constitutional due process rights had been violated. His counsel's single mention of the word "constitutional" at the hearing on his motion for continuance was insufficient to call the matter to the trial court's attention, especially in the haste in which the trial was conducted. But even a brief review of the record leaves no question that Ricardo's complaint was not merely

---

18. *See* Tex. Fam.Code § 161.103(e).

that his due process rights had been violated, but that he could not have voluntarily relinquished his sons by signing an affidavit he did not understand because it was in English. This was the principal focus of the trial.

The Court concludes that Ricardo has not raised anything *but* a constitutional issue on appeal. It is true that the issue stated in Ricardo's briefs in the court of appeals and this Court, and on which they focus, is whether his signature "was procured in a manner that violated Ricardo's due process rights", and this is the focus of his brief and petition. But we are obliged by rule to treat the issue "as covering every subsidiary question that is fairly included." [19] Moreover, we construe briefs "liberally . . . in order to obtain a just, fair and equitable adjudication of the rights of the litigants." [20] This practice becomes even more important when fundamental rights are at stake. Ricardo's briefs in this Court and the court of appeals can fairly be read to raise a broader concern than constitutional due process. After pointing out the requirements of chapter 161 of the Texas Family Code, the briefs state: "Ricardo relinquished one of his most fundamental rights, i.e., the right of parenthood, by signing a document that he could not read and was never put forth to him in his native tongue." One could well expect more elaboration of the argument, but when the briefs are read in light of the record, Ricardo's complaint is clear.

It was certainly clear to the Monteguts. In their fifty-page brief in the court of appeals, they argued at great length that the evidence showed that Ricardo understood enough English to know what he was doing and that the affidavit was translated

sufficiently for him. The Monteguts devoted only a few sentences of their brief to arguing that Ricardo's sole complaint was of a denial of due process. The court of appeals restated Ricardo's complaint on appeal as one of due process, but it also added: "Ricardo claims that because he does not understand English, he did not understand what he was signing." [21] The court concluded that "Ricardo's right to have the affidavit accurately interpreted in a language he understands is a matter of due process," [22] but concluded that the evidence failed to show that Ricardo did not understand what he was signing.

As the Court points out, at one point in oral argument Ricardo's counsel appeared to disavow any complaint except a denial of due process. What the Court does not see fit to mention is that Ricardo's counsel opened his argument stating: "We further believe that in terms of the statutory requirements of placing a child were totally violated."

The extent of Ricardo's understanding of English may be disputed, but there is no dispute that it is limited. It seems unjust to me to terminate his parental rights despite that limited understanding on the ground that his brief is not clearer. To read Ricardo's brief as rigidly as the Court does simply compounds his limitations. I would consider the substance of his argument: was his affidavit of relinquishment effective given his limited understanding of English?

**B**

Maria's guardian ad litem should have been clearer at trial, even though she had only a month to prepare. She should have pointed out more directly Maria's conten-

---

19. Tex.R.App. P. 55.2(f).

20. See *supra* note 14.

21. 117 S.W.3d at 4.

22. *Id.* at 4.

tion that she had been misled into signing the affidavit of relinquishment by the Monteguts' promise to her that they would provide her reports and photographs of the boys and would let her send them gifts. There is no question that this is her principal complaint on appeal.

The Court refuses to consider this complaint because Maria did not ask the trial court to rule on whether the Monteguts' promise was legally unenforceable. But even though Maria did not request the trial court to rule, the trial court did rule: in its judgment it expressly recognized she had "presented issues of fraud, duress, and overreaching to the Court to deny that her [affidavit] was signed voluntarily," and it specifically found against her on those issues. The Court offers no authority for imposing a requirement that the trial court have ruled on the subsidiary question whether the promises made to Maria were enforceable.

I would therefore consider the substance of Maria's argument: did the promises made to her defeat the effectiveness of her affidavit of relinquishment?

### III

### A

Section 161.001 of the Family Code states that a parent-child relationship may be terminated

> "if the court finds by clear and convincing evidence: (1) that the parent has ... (K) executed before ... the suit is filed an unrevoked or irrevocable affidavit of relinquishment of parental rights as provided by this chapter ...; and (2) that termination is in the best interest of the child." [23]

An affidavit of relinquishment of parental rights is not a simple instrument. Section 161.103(b) of the Family Code requires that a parent must swear to all of the following:

(1) the name, address, and age of the parent whose parental rights are being relinquished;

(2) the name, age, and birth date of the child;

(3) the names and addresses of the guardians of the person and estate of the child, if any;

(4) a statement that the affiant is or is not presently obligated by court order to make payments for the support of the child;

(5) a full description and statement of value of all property owned or possessed by the child;

(6) an allegation that termination of the parent-child relationship is in the best interest of the child;

(7) one of the following, as applicable:

    (A) the name and address of the other parent;

    (B) a statement that the parental rights of the other parent have been terminated by death or court order; or

    (C) a statement that the child has no presumed father and that an affidavit of status of the child has been executed as provided by this chapter;

(8) a statement that the parent has been informed of parental rights and duties;

(9) a statement that the relinquishment is revocable, that the relinquishment is irrevocable, or that the relinquishment is irrevocable for a stated period of time;

(10) if the relinquishment is revocable, a statement in boldfaced type concerning the right of the parent signing

---

**23.** Tex. Fam.Code § 161.001(1)(K), (2).

the affidavit to revoke the relinquishment only if the revocation is made before the 11th day after the date the affidavit is executed;

(11) if the relinquishment is revocable, the name and address of a person to whom the revocation is to be delivered; and

(12) the designation of a prospective adoptive parent, the Department of Protective and Regulatory Services, if the department has consented in writing to the designation, or a licensed child-placing agency to serve as managing conservator of the child and the address of the person or agency.[24]

It should go without saying that a person who executes such an affidavit must have some idea of all the facts to which he is required to swear. It is not enough that an affiant understand that he is severing his relationship with his children; he must understand what that means. The purpose of the statute is to prescribe the specific things a person must swear that he knows before he surrenders his children. Furthermore, proof that he did must be clear and convincing.

So the question in this case is this: how much of the affidavit Ricardo signed did he understand? The answer, as a detailed review of the evidence below demonstrates, is that the most he could *possibly* have understood was that by signing the affidavit he was losing his sons. There is no evidence at all, for example, that Ricardo thought relinquishing his sons was in their best interest, or that he knew what rights and duties parents have, or that he understood his decision was irrevocable for sixty days. The most important part of the affidavit, and the only part that may

have been paraphrased to him in Spanish, omits the word "not" and consequently states the very opposite of what was intended. If an English-speaking lawyer could not get the language right, it is hard to imagine how Ricardo could have been expected to understand it.

The Court's view of this case is that the evidence was conflicting and the trial court made the call, end of story. But only last Term we held that evidence for terminating a parent-child relationship must be carefully reviewed to determine whether it is clear and convincing.[25] Specifically, we said:

> In a legal sufficiency review [of a termination of parental rights], a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true.[26]

In my view, when one considers all the evidence regarding what Ricardo understood or could have understood and then reads the affidavit he signed, it is impossible to conclude that there is any clear and convincing evidence that he understood a word of what he signed.

Ricardo testified through an interpreter. He stated that he had been in the United States four years and was working as a cook. His supervisor, he said, spoke only English, and a co-worker had to translate for him. He stated that he could neither read nor write English. Asked whether he understood some English, he answered, "Very little. A word here and there." Regarding the signing of the affidavit of relinquishment, he stated that he understood only that he was required to sign and initial the affidavit, nothing else. Spe-

---

24. *Id.* § 161.103(b).

25. *In re J.F.C.,* 96 S.W.3d 256, 266 (Tex. 2002).

26. *Id.*

cifically, he testified as follows, as translated by the interpreter:

Q Now, Mr. Duenas, could you tell us what happened on the day that the Affidavits of Relinquishment of Parental Rights were signed?

A Uh, they picked me up at my work. They took me to an office. What they have that papers that I signed that I didn't know what I was signing and nobody explained to me anything.

* * *

Q Do you recall who gave you the papers?

A Well, I don't know if it was a lawyer or notary, but they gave me the paper. He said, "Sign here, and then date it and initial it there," and that was it.

* * *

Q Did—did the man that gave you the papers to initial and to sign, did he translate for you what those papers meant?

A No.

* * *

Q So all you know is that the last page has your signature; is that correct?

A Yes.

Q And the second to the last page has your initials; is that correct? Actually, it's the third.

A Yes.

Q And are those the areas where the man told you to put your initials?

A Yes.

Q And in putting those initials, did that man or the secretaries or anybody in that room, did they translate to you what that document meant?

A No.

* * *

Q And, Mr. Duenas, how much English, if any, do you understand?

A I only understand "put your name" and "initial that thing there." That's all.

Q Was that what was translated to you?

A Yes. It was translated to me, but I understood that. Only that.

Maria verified that Ricardo does not speak English and cannot understand it. "One time," she testified, "I told him to say the word 'seagull.' That's what I got out of him." Regarding his signing the affidavit of relinquishment, she testified as follows:

Q ... [W]ho translated the document for Mr. Duenas?

A Nobody translated.

Q What was Mr. Duenas told he was signing?

A When I got there, I didn't really tell him what it was. I just told him, "Put your name here, put the date there."

Q Did any of the secretaries for the attorney translate to Mr. Duenas what was in that document?

A No. I don't think anybody there spoke Spanish.

Q So the attorney didn't translate it either for him?

A No. He was just reading it in English, pointing and then out—because there would be sometimes that Ricardo wouldn't catch on and he would point and say, "Put your name there," but then he would just initial it. So I'd have to tell him—(speaking Spanish)—"Put your whole name."

Q And did your mother or your sister translate the seven-page document to Mr. Duenas?

A My sister doesn't speak good Spanish. My mom—she tried to start out telling him, and I told her, "Shush."

Q So no one in that office, while Mr. Duenas was signing the Affidavit of Relinquishment, explained to him that this document meant that he was giving up his rights as a parent forever; is that correct?

A No.

Q And no one explained to him by signing this document he couldn't change his mind until after 60 days—

A No.

Q —is that correct? And by that, I mean translating it into Spanish what he understood the document meant?

A No.

Q To your knowledge, had Mr. Duenas ever talked about giving up his babies for adoption or anything like that?

A No, of course not. He used to tell me if I wanted to be stupid and—and if I didn't act right, that he would take the babies and he would raise them. And I would tell him, "You're crazy."

Maria's mother, Guillerma, understands both English and Spanish, and she spoke to Duenas in Spanish in the lawyer's office. This is what she testified:

Q Did [the lawyer] read at this time to anybody in Spanish?

A No. No, he can't read it in Spanish.

Q Okay. Did anybody ask you to—or let me rephrase it. Did you translate any of the documents for anybody else?

A No, ma'am. I wasn't given the chance.

* * *

Q Did you tell Ricardo Duenas what the papers were about in Spanish?

A No, no. Uh, I wasn't given that opportunity.

Q So you didn't ever speak Spanish at all during your—the time that you were at Mr Ciavaglia's [the lawyer]?

A The little words I said, it was not that much. It was my own, uh—Mr. Ciavaglia wanted someone to interpret so he could understand what was going on, and that's all.

Q And so you did say a few words in Spanish, didn't you?

A A few, a few.

Q And what was it that you said? Tell us in English what you told Mr. Duenas.

A I looked at him and I told him that, uh, Mr. Ciavaglia wanted those papers, uh, interpreted to him.

Q And what else did you tell him?

A Nothing, nothing.

Q And didn't you tell him, Mr. Duenas, that these were papers that they wanted him to sign where he was giving up his rights to the babies? Didn't you tell him that in Spanish?

A No, no. No.

Esther, Maria's sister who arranged for the adoption, testified that she understood some Spanish but could not speak it fluently and could not and did not converse with Ricardo. As for what Ricardo understood about what was happening, this is her account of the events:

Q . . . And then did you discuss the father [with the lawyer] and how to get him involved in this process?

A The babies looked like him, but we weren't absolutely sure that he was the father. DNA testing had not been done. It was assumed that he was. And I am

not fluent in Spanish, so I cannot communicate with him to—with him. So, if anything, it would have to be told to him. My mother and my sister would have to be the ones.

* * *

Q Did Ricardo Duenas make any motions or do anything that would indicate that he knew what was going on that day?

A Yes.

Q What was that?

A He agreed to put his initials in the areas where he was—where he needed, and he was asked over and over again if he understood.

Q And who asked him over and over if he understood?

A Mark [the lawyer] asked him, and my mother asked him also.

Q And did your mother ask him in Spanish if he understood what he was doing that day?

A Yes.

Q But Mr. Ciavaglia did not speak Spanish to Ricardo Duenas; is that right?

A Right. That is correct.

* * *

Q [By the Court:] Okay. And can you tell me if someone explained each of those lines to him, or was it just a cursory summary, or was it a detailed explanation?

A Mark [the lawyer] explained it in detail. And Ricardo kept on, like he acknowledged what was being said. And then my mother made an attempt also in Spanish and asked Ricardo did he understand, and he said yes, and he continued putting his initials on there.

Q [By the Court:] But how could he understand if no one went line by line in Spanish and read that to him? That is—that's my dilemma right here.

A I can't read his mind, ma'am. I don't know. He said he understood. That's all I know.

Q [By the Court:] And who asked him if he understood?

A Mark did.

Q [By the Court:] In English?

A Yes.

Q [By the Court:] And he answered in English? I mean, if you can remember.

A He did not speak much. He just nodded his head. I don't recall him speaking much at all.

* * *

Q Based on your observations of Ricardo Duenas and your sister in Mr. Ciavaglia's office, do you believe both of them understood what was going on?

A Yes, I do.

Q And do you believe that the relinquishment document was, in fact, explained to Ricardo Duenas in Spanish?

A Yes. As much as he needed, yes.

* * *

Q Okay. At one point your mother attempted to translate the document for Mr. Duenas; is that correct?

A Yes, that is correct.

Q And what happened during that translation?

A She asked him if he understood all the details, and my little sister also communicated with him in Spanish.

Q So it was actually both your mother and sister that were talking to him in Spanish?

A Yes. I remember both of them doing that, doing some—

* * *

Q And the—are you sitting here and telling the Court today that on September 24th, when the attorney and the secretaries presented the seven-page document to Mr. Duenas, that those seven pages were translated to Mr. Duenas in Spanish?

A Each page was not translated word for word, no.

* * *

Q So the total sum of the translations were actually three or four sentences, weren't they?

A I don't recall exactly.

Q It was very quick, wasn't it, the translation that your mother supposedly—or Maria gave to him (indicating)?

A It wasn't within, like, 30–minute time intervals, no. They were not that long.

Q Would three or four sentences be about right, the translation that your mother did or that Maria did?

A I don't recall exactly how many lines were said.

* * *

Q You testified earlier that you're "not very fluent in Spanish." Wasn't those your exact words?

A Conversational Spanish, yes.

Q Okay. So, then, how is it that you can sit here today and tell this Court that Mr. Duenas had heard as much as he needed to hear?

A I didn't state that.

Q Yes, you did. You didn't just say on testimony from [counsel for the Monteguts]—on your direct testimony that he heard, and I quote, "as much as he needed"?

A Okay. As much as he needed apparently to understand because he nodded and he acknowledged that he understood repeatedly.

Q Okay. But it was being read to him in English, correct?

A That's correct.

Q Okay. If I started speaking to you in French right now—you don't speak French, do you?

A No.

Q And I kind of nodded my head and was speaking to you in French, would you have any idea what I was talking about if I just started speaking French right now?

A No.

Q Okay. But if I smiled at you and nodded my head and looked sort of favorably upon you, is it possible that you might just nod your head back?

* * *

A No, because I wouldn't know what I would be agreeing to.

Q But how would you even know you were agreeing to anything if you didn't understand the French language?

A I would not be able to elicit a response if I did not understand what's being said.

Q Okay. Thank you. Now, you said that on the 21st you called Mr. Ciavaglia's office and you had talked to Detective Goetschius and you got all of this arranged before you went over there on the 24th. Didn't you think it might be a good idea to talk to either Ricardo or [Maria] before you got all this arranged to find out whether they were even in agreement with it?

A I have not had any communication with Ricardo one on one because I cannot converse fluently in Spanish.

\* \* \*

Q   On September 24th, after Mr. Duenas signed the papers, you spoke to him; is that correct?

A   After?

Q   After the papers were signed.

A   Outside of the lawyer's office.

Q   And would you tell the Court what you said?

A   I told him in English—I walked to him and shook his hand.   I told him, "Thank you.   What you are doing is very courageous."

Q   And did your mother translate what you said?

A   I asked her so he could make sure to understand what I was saying.   And she started to—and then she said—I can't recall word for word, that, "Oh, he says he understands.   I don't need to."

Mark Ciavaglia had been in practice six years when he agreed to represent the Monteguts in adopting Ricardo's and Maria's sons.   He does not understand Spanish.   Concerning the events in his office, he testified as follows:

Q   How did you receive the information [for the affidavit of relinquishment] for Ricardo Duenas?

A   I asked him verbally.

Q   And was he able to understand what you asked him and relay that information?

A   He seemed to be.   He seemed to understand English and responded to questions.

Q   When you asked for his name, did he respond with his name correct—give you a detail of his name, or did he write it out?   How did he do it?

A   He pronounced it, and I just wrote it.   As I wrote his last name, I spelled it out loud; and he acknowledged that was correct.

Q   And you don't speak Spanish, correct?

A   That's correct.

Q   And he—did he respond to what is your address and other information, what is your Social Security number, what is you Texas driver's license number?

A   At some point when I asked for his Social Security number, I don't recall who responded or—as to the address.   I was asking, just writing the information down.   As to the question about his Social Security number, uh, he didn't really respond.   And I don't remember if it was Maria or [Guillerma] that said he doesn't have a Social Security number, didn't have his wallet with him.

\* \* \*

Q   What specifically did you tell the parties?

A   I again introduced myself and told them—or stated to them, "Does everyone understand why we're here today?   You're here to sign documents.   I'm going to offer to you some documents for your inspection and your signature that will begin the process of adopting these children."

Q   And did Ricardo Duenas do anything that would indicate whether he understood what you were saying?

A   He said very little.   During the course of that statement, I said—I kind of looked at each and every one of them.   I said, "Do you understand?   Do you understand?"   Ricardo was to my left, and I said, "Do you understand?"   And he nodded.   I specifically said, "Do you understand," in English.   And he nodded his head yes and he mouthed yep.   Like yep.

* * *

Q And what discussion was had with Mr. Duenas about his document?

A I explained that I would offer to each of them two documents. I turned to Mr. Duenas and I said, "This document, the first document, is an affidavit that acknowledges your paternity." And I, knowing that sometimes legalese is intimidating for laypersons, I asked, uh—I kind of made sure that they were aware in common English what that meant. I said, "By signing this document, you're admitting that you're the father of these children." And there's some other reference, statutory information.

Q Okay. Now, did he say yes, he understood, or no, he didn't? Or did he acknowledge anything?

A He didn't really acknowledge either way. He just looked at the document.

Q Okay. Now, with regards to the Affidavit of Relinquishment of his parental rights, did you explain what that document was?

A I did.

Q And did he make any response whatsoever to your explanation?

A Not at all.

Q Okay. Was there any discussion amongst the people in the room whether he understood or whether he should have a translator or anything?

A The documents that I offered first, the Affidavit of Relinquishment, as we were going through the form and I was explaining it to him, and I use the same term each time, "By signing this document, you fully, finally, and forever give up all parental rights to these children." As I was going through that, Maria noted—she was sitting across from Mr. Duenas. She noted that her name was spelled incorrectly on the document.

Q Okay. So what happened then?

A Well, at that point she corrected the spelling of her last name. I went back and corrected all the documents. And this is after he had signed it, okay.

Q So, then, he had to resign the documents, is that correct?

A That's correct.

Q Now, before he resigned the documents, was there any point in time that anybody in Spanish went over any parts or all of those documents?

A Yes.

Q What happened and who supposedly was it that went over those documents with him in Spanish?

A Ms. Pruitt.

Q And would that be Maria's mother?

A That's correct.

Q And what—what do you recall her doing with regards to that document?

A There's a specific part of the form that requires a set of initials by each one. It's a double—spaced section. And it denotes if—I'm paraphrasing-it says that they understand the importance of this document.... I directed his attention specifically to this section and began to read it. And at that point, Esther said, "Mom, why don't you translate that to him to make sure he understands?" At that point, Maria turned to her mother in a very agitated fashion and said, "He don't give a shit. He don't even buy diapers." So, nonetheless, Ms. Pruitt did continue to, uh, what sounded to me was to translate that in Spanish.

Q Did it take her awhile to read that into Spanish?

A She didn't seem to read it. She was repeating what I was saying, which was paraphrasing this language.

Q Okay. And was that what you were saying basically that, "I understand that I'm executing this relinquishment, and I'm giving up my rights to my children"? ... In your words, how did you explain that in English before it was translated.

A What I told him was that, "This document is very—excuse me—very important. And that by signing it, you're acknowledging that you understand this document and you understand the consequences of this document, and that is that you fully, finally, and forever give up any parental rights to your children. And you also relinquish your right and give up your right to change your mind."

Q [By the Court:] And you said that pretty much the way you just told me?

A That's correct.

Q [By the Court:] And you're telling me that Ms. Pruitt, the grandmother, interpreted that after you said it in English?

A She was speaking in Spanish. I can't say.

Q [By the Court:] You can't speak Spanish. But you think she was translating what you said in English?

A That's correct.

Q [By the Court:] Go ahead.

Q And then what happened after the—Ms. Pruitt said things in Spanish to Mr. Duenas?

A Uh, Mr. Duenas then initialed beside each line. He executed the document in the signature spaces as provided in front of the witnesses. Uh, and the witnesses signed and, uh, the person that was the notary notarized the document.

* * *

Q Mr. Ciavaglia, are you telling this Court that Ms. Pruitt translated these seven pages to my client, Mr. Duenas?

A No, ma'am.

Q In fact, she probably said a sum total of three or four little sentences the whole time she was there in Spanish to my client, didn't she?

A She said more than that.

Q And when you would say, "You need to sign on this blank," and the translation would have been (speaking Spanish). If that was repeated several different times, you don't know that the translation was, "You're giving up your rights to your children forever," and rather the translation is, "You need to sign on this line, you need to sign on this line, and you need to sign on this line," which was being translated? Do any of your staff know what Ms. Pruitt was translating to Mr. Duenas?

A I could testify as to what I know; and I do not speak Spanish and I do not know what she translated.

* * *

Q What you're saying is that you made an assumption that because—when you were talking in English and he was nodding his head, that he understood what was going on?

A I believed he knew what was going on, yes.

Q And would you know that in pointing to him where he needed to sign, that if someone was telling him you need to sign there, if there was—you said he was very quiet. In fact, he hardly talked at all is what you said a few minutes ago; is that correct? Mr. Duenas was very quiet?

A Yes.

Q In fact, he hardly talked at all?

A   Correct.

* * *

Q   And you assumed that by Mr. Duenas' silence, that he was agreeing to everything; is that correct?

A   I assumed he understood.

* * *

Q   Okay. And isn't it true that in the draft that had to be redone because of the misspelling of the name, that at one point Mr. Duenas—forgive me—Mr. Duenas had either initialed where he was supposed to sign or signed where he was supposed to initial or vice versa?

A   That's correct.

Q   Okay. So what—wouldn't that kind of indicate to you that he didn't understand what he was supposed to do in that situation?

A   No.

Q   Okay. And while Ms. Pruitt was talking with Mr. Duenas, you don't have any idea what she was talking to him about, do you?

A   In Spanish?

Q   Yes.

A   No.

Q   Okay. And you said that you were basically paraphrasing the document; is that correct? And that she was repeating what you were paraphrasing?

A   Yes.

Q   Don't you think it's kind of possible since we're repeating paraphrasing that something might have been lost in the translation?

A   Since I don't know—you're asking me?

Q   Is it possible?

A   Is it possible? Sure.

Finally, Ciavaglia's paralegal, Laura Hernandez, was present at the meeting and witnessed the Duenas's execution of the affidavit of relinquishment. Hernandez understands Spanish but cannot speak it. She testified to what she observed as follows:

Q   Did—at the beginning of the conference, did you have occasion to hear Mr. Ciavaglia say anything to the parties?

A   He just explained what was going on, and if they didn't—you know, if they didn't want to go through with it, they didn't have to. And they wanted to make sure that everybody knew what was going on and they understood what was going on.

Q   Did you—did you notice whether Ricardo Duenas actually made any indication that he understood? Just from the preliminary statements that Mr. Ciavaglia gave, that he understood?

A   We weren't sure if he understood. And Esther kept saying, "Make sure he understands what he's saying." And then Maria said, "Well, he don't care."

Q   Okay. And are you talking about later on as he was presented with this Affidavit of Relinquishment?

A   Right.

* * *

Q   Okay. Did Mr. Ciavaglia explain the papers to Maria Inocencio?

A   Yes, he did.

Q   Was his explanation to her more detailed than it was to Ricardo Duenas?

A   No, because I explained it to Maria, and then she said okay. Then he started to explain it to the father, and he, you know—he kind of looked like he didn't know what he was saying. Then the grandma translated it to him, and he was shaking his head yes. When she was translating—I understand Spanish. I can understand it, but I can't speak it

back. And she was telling him the correct things.

Q Okay. So would you tell the Court what it was that the grandmother was actually telling Mr. Duenas?

A That he was giving up his rights of the children, and that he will no longer be responsible for them. And that once this is all through, that's it, you know.

Q So did she tell him whether or not he would have an opportunity to change his mind later?

A No, she didn't.

Q Okay. Based on what you heard that the grandmother translated in Spanish to Mr. Duenas, do you believe he fully understood—

A Yes.

Q —what was happening?

A Yes, because he kept shaking his head yes, he understood. And she just kept telling him to sign it, just sign it. Maria kept telling him just to sign it.

Q So Maria didn't really want to have much discussion?

A No....

* * *

Q Now, you were actually a witness on both the father's Affidavit of Relinquishment of Parental Rights and also the mother's; is that right?

A That's correct.

Q And do you feel, based on your observations in the room and what you saw and what you heard of the parties, that they both understood fully what they were signing?

A Yes, ma'am.

* * *

Q And you heard what Esther was telling Maria and what Maria was telling Mr. Duenas?

A Yes.

Q And in the seven pages of the affidavit, you're saying that Ms. Pruitt translated that affidavit to Mr. Duenas?

A She was just telling him that he was giving up his rights as a father because Maria kept saying, "Don't worry about this. Just tell him to sign it there and he'll sign it."

Q And, in effect, Ms. Pruitt didn't tell him about terminating parental rights. She just said, "Sign it," didn't she?

A No.

Q "Just sign here and sign here"?

A Maria was saying, "Just sign it." The grandmother was trying to translate it to him, but Maria was the one that kept pushing. "Initial, sign it."

Q In fact, the grandmother never translated to him that his rights are going to be terminated right then and there?

A She's just saying that his father— he wasn't going to be the father anymore, that he's giving up his rights. That's what she was telling him.

Q And you're saying she was telling him that in Spanish?

A Yes, she was.

Q And she wasn't telling him to sign here and sign there, sign the different parts? She never told him that?

A Maria was pointing out to him where to sign, and he would sign it.

Q And the attorney was there during the times that Ms. Pruitt was translating, is that correct?

A Yes, ma'am.

Q And did Mr. Duenas ever say anything during that whole process of signing any of the affidavits?

A He did not.

Q Never said a word?

A Never said a word.

Q Did anyone verify with him that he understood?

A They asked him if he understood, and he said yes.

In sum, there is no evidence that Ricardo read the affidavit of relinquishment or that he was able to read it, and the uncontradicted evidence of several witnesses is that the affidavit was not translated to Ricardo. Several witnesses testified that they thought or believed or assumed that Ricardo understood, and that he indicated by nodding his head or mouthing "yep" that he understood, but none of these witnesses stated what it was exactly that Ricardo understood. It seems fairly clear that he knew he was losing his children, but the paralegal, who understood Spanish, testified without contradiction that he was never told in Spanish that his affidavit would be irrevocable for sixty days. There is no evidence that Ricardo thought adoption was in his sons' best interest, as he was required by statute to swear, or that he understood the parental rights he was losing, again as the statute required him to swear.

What various witnesses' meant when they testified that Ricardo "understood" cannot be appreciated without reading the affidavit Ricardo signed. This is what it stated:

### FATHER'S AFFIDAVIT OF RELINQUISHMENT OF PARENTAL RIGHTS

STATE OF TEXAS

COUNTY OF GALVESTON

BEFORE ME, the undersigned authority, on this day personally appeared RICARDO ANTONIO DUENAS who, by me being duly sworn, in the presence of the undersigned credible witnesses, made the following statements, and swore that they were true:

"My name is RICARDO ANTONIO DUENAS. Social Security Number _____, Driver's License Number [_____] in the State of Texas. My age is 26 years. My residence address in 3714 Avenue S, Galveston, Galveston County, Texas 77550."

"I am the father of twin children":

"[L.M.I.], a male child born on April 9, 1999, and [J.A.I.], a male child born on April 9, 1999, both twin children born to LUZ MARIA INOCENCIO at UTMB, Galveston, Galveston County, Texas."

"The natural mother of the children, LUZ MARIA SYLVESTRE INOCENCIO and the children reside at 806c— 3RD Avenue South, Texas City, Galveston County, Texas 77590."

"I am not presently obligated by court order or decree to make payments for child support in this or any court or jurisdiction."

"No property is owned or possessed by the children."

"I designate *MILES QUENTIN MONTEGUT* and *MONICA GAIL MONTEGUT*, qualified persons, as managing co-conservators of the children. I have been informed that my parental rights, powers, duties, and privileges are as follows:

1. the right to have physical possession, to direct the moral and religious training and the [sic] establish the legal domicile of the children;

2. the duty of care, control, protection, and reasonable discipline of the children;

3. the duty to support the children, including providing the child with clothing, food, shelter, medical care, and education;

4. the duty to manage the estate of the children, except when a guardian of the estate has been appointed;

5. the right to the services and earnings of the children;

6. the power to consent to marriage, to enlistment in the Armed Forces of the United States, and to medical, psychiatric and surgical treatment;

7. the power to receive and give receipt for payments for the support of the children and to hold or disburse any funds for the benefit of the children;

8. the power to represent the children in legal action and to make other decisions of substantial legal significance concerning the children;

9. the right to inherit from and through the children; and,

10. any other rights, privileges, duties and powers existing between a parent and children by virtue of law, including decisions concerning medical care and treatment."

"I freely and voluntarily give and relinquish to the above-named managing co-conservators all of my parental rights, powers, duties, and privileges."

"I fully understand that a lawsuit will be promptly filed in a Court in Galveston County, Texas to terminate forever the parent-child relationship between me and the above-named children. I fully understand that the termination suit may or may not be combined with a suit to adopt the children. I understand that either way, once the Court terminates my parental rights, I have no further say concerning my children, whether or not my children are adopted then or at some later time."

"I know that I have the right to appear personally before the Court, with an attorney of choice, to testify about my desires with respect to my children. However, I do not want to go to court in person. I have been encouraged to seek independent legal advice, but I do not feel that is necessary. I want this Affidavit of Relinquishment of Parental Rights presented to the Court."

"Because I do not want to testify in person before the court, I freely and voluntarily waive and give up my right to the issuance, service, and return of citation, notice and all other process in any suit to terminate my parental rights or in any suit to terminate my parental rights joined with a suit to adopt. By executing this affidavit and desiring to having [sic] it presented to the court on my behalf, I freely and voluntarily consent to the jurisdiction of a court of competent jurisdiction of the State of Texas. I do not want to be informed further about the lawsuit, and I waive and give up my right to be given notice about anything [sic] proceedings in the lawsuit. I specifically agree that a final hearing in the lawsuit may be held at any time without further notice to me. I waive and give up my right to have the official court reporter make a record of the testimony in the lawsuit. Furthermore, I do not want to be mailed or given a copy of the judgment terminating my parental rights and do not want to be notified of the signing, rendition, or entry of that judgment. Therefore, I waive and give up my right insist [sic] that those things be done. I also consent to have any suit affecting the parent-child relationship filed or to be filed with respect to the above-identified children be decided by a family law master appointed pursuant to Texas Government Code § 54.001."

"If I am in the armed services of the United States at this time, that fact in no way interfered with my freedom the [sic] make my decision to execute this affidavit, and, insofar as this matter is concerned, I waive all rights, privileges, and exemptions existing or that may hereafter exist in my favor under the Soldiers' and Sailors' Civil Relief Act of 1940, including the appointment of counsel to represent me in this cause."

"I FULLY UNDERSTAND THAT I MAY NOT BE FURTHER INFORMED ABOUT THE TERMINATION SUIT OR ABOUT ANY OTHER HEARING OR PROCEEDING AFFECTING THE CHILD NAMED IN THIS AFFIDAVIT."

"Termination of the parent-child relationship is in the best interest of the children. I understand that I made this termination possible by executing this affidavit. With that in mind, I hereby declare that this Affidavit of Relinquishment of Parental Rights is and shall be irrevocable for sixty (60) days. I FULLY UNDERSTAND THAT, IF I CHANGE MY MIND, I CANNOT FORCE THE MANAGING CONSERVATOR TO DESTROY, REVOKE, OR RETURN THIS AFFIDAVIT AND THAT I CANNOT TAKE BACK OR UNDO THIS AFFIDAVIT IN ANY WAY DURING THIS 60–DAY PERIOD. I FURTHER UNDERSTAND THAT MY PARENTAL RIGHTS PROBA-BLY WILL HAVE ALREADY BEEN ENDED FOR ALL TIME BEFORE THIS 60–DAY PERIOD EXPIRES. I also understand that, if my parental rights have not been ended within this 60–day period, this affidavit shall remain in full force and effect until I revoke it. I FULLY UNDERSTAND THAT, AT ANY TIME UNTIL THIS AFFIDAVIT IS REVOKED, MY PARENTAL RIGHTS MAY BE TERMINATED FOR ALL TIME."

"I have carefully considered alternate plans for my children's future and have obtained the advice of whatever family members, friends, or other persons and professionals I feel were necessary to help make this decision. This decision is very difficult for me to make, and under other circumstances I might have made a different decision. Nevertheless, under the circumstances I find myself in, I have decided that I cannot provide properly for my children's physical and emotional needs, and I want *MILES QUENTIN MON-TEGUT* and *MONICA GAIL MONTEGUT* to provide my children a permanent home. I declare that I fully understand the meaning of this Affidavit of Relinquishment of Parental Rights and the finality of my action in signing it, and understanding all of this, I am signing it freely and voluntarily, and with the firm conviction that this decision is the best available alternative for my children."

"I am signing this affidavit today because I want to sign it and not because any other person or persons want me to sign it. I am ready emotionally and in every other way to make the decision I am making today. I am signing this affidavit in the presence of the two undersigned witnesses, each of whom is present and acting as a witness. I want them to be here and witness my signature. I am also signing this affidavit before a notary public who has asked me under oath whether or not each and every statement in this affidavit is true and correct and has advised me not to sign it unless it is true."

s/ RD "I REALIZE THAT I SHOULD NOT SIGN THIS AFFIDAVIT UNTIL I HAVE READ AND UNDERSTOOD EACH WORD, SENTENCE, AND PARAGRAPH IN IT. I REALIZE THAT I SHOULD NOT SIGN THIS AFFIDAVIT OF RELINQUISHMENT IF THERE IS ANY THOUGHT IN MY MIND THAT I MIGHT SOMEDAY SEEK TO CHANGE MY MIND. I REALIZE THAT I SHOULD [SIC] SIGN THIS AFFIDAVIT OF RELINQUISHMENT IF I AM NOT THINKING CLEARLY BECAUSE OF ILLNESS, MEDICATION, MY EMOTIONAL STATE, OR ANY OTHER REASON. BECAUSE I REALIZE HOW IMPORTANT THIS DECISION IS FOR THE FUTURE OF MY CHILDREN, I HAVE PUT MY INITIALS BESIDE EVERY LINE OF THE PARAGRAPH SO THAT IT WILL ALWAYS BE UNDERSTOOD THAT I HAVE READ THIS AFFIDAVIT OF IT."

SIGNED on this <u>24</u> day of <u>Septieber [sic]</u>, 1999.

<u>s/ Ricardo A. Duenas</u>

<u>s/ Laura D. Hernandez</u>          <u>s/ Esther Gonzalez</u>

<u>1232, 2nd Ave. North</u>           <u>8161 ½ Grofton</u>

<u>Texas City, TX 77590</u>          <u>Houston TX 77017</u>

### VERIFICATION

STATE OF TEXAS                    }

COUNTY OF GALVESTON      }

BEFORE ME, the undersigned authority and notary public, on this day personally appeared RICARDO ANTONIO DUENAS, who, being by me duly sworn on his oath, deposed and said that he is the affiant and that he has read the foregoing Affidavit of Relinquishment of Parental Rights and that the statements contained therein are within his personal knowledge and are true and correct.

This Affidavit of Relinquishment of Parental Rights was subscribed and sworn before me on the <u>24th</u> day of <u>September,</u> 1999, by

[notary seal]                     <u>s/ Claudia Tibaldo</u>
                                   Notary Public, State [sic] of Galveston

STATE OF TEXAS                    }

COUNTY OF GALVESTON      }

BEFORE ME, the undersigned authority, on this day personally appeared <u>Laura D. Hernandez</u> and <u>Esther Gonzalez,</u> witnesses whose names are subscribed to the foregoing instrument in their respective capacity, and both persons being by me duly sworn, declared to me, in the presence and hearing of the affiant _____, [sic] that the affiant had declared to them that the foregoing instrument is an Affidavit of Relinquishment of Parental Rights, that he executed it as such and wanted each of them to sign it as a witness to his execution of the same; and upon the oaths each witness stated further that he/she did sign the same as witness, in the presence of the affiant and at his request, that affiant was at that time eighteen years of age, or older, was of sound mind, and executed the affidavit of his own free will; that each of said witnesses was then at least eighteen years of age.

<u>s/ Ricardo A. Duenas</u>
RICARDO ANTONIO DUENAS

<u>s/ Laura D. Hernandez</u>
Witness

<u>s/ Esther Gonzalez</u>
Witness

SUBSCRIBED AND ACKNOWLEDGED BEFORE ME by RICARDO ANTONIO DUENAS, the Affiant, and SUBSCRIBED AND SWORN TO before me by said witnesses <u>Laura D. Hernandez</u> and <u>Esther Gonzalez</u> on this <u>24th</u> day of <u>September,</u> 1999.

[notary seal]
                                   <u>s/ Claudia Tibaldo</u>
                                   Notary Public, State of Texas

Contrary to what the affidavit states, there is no evidence that Ricardo had any idea what his "parental rights, powers, duties, and privileges were, or that he had 'the right to appear personally before the Court, with an attorney of choice,'" or that the affidavit was irrevocable for sixty days. The careful reader will note that in what appears to be the most crucial part of the affidavit, where the words are all in upper case and bold font, and where the affiant must initial every line, Ricardo was required to swear:

> I realize that I *should* sign this affidavit of relinquishment if I am not thinking clearly because of illness, medication, my emotional state, or any other reason.

(Emphasis added.) It seems obvious to me that this was an error, but then I speak English. It would be much less obvious to me if, like Ricardo, I did not.

### B

To recite the evidence exhaustively and verbatim, as I have just done, is what the Court calls "effectively second-guess[ing] the trial court's resolution of a factual dispute". I do not see how one could be truer to the record than by quoting it, which of course, the Court does not do. The Court bases its second-guessing accusations on a recharacterization of the record that simply does not support the Court's conclusions.

The Court has three points. First, the Court says, "witnesses testified that Duenas appeared to understand what was transpiring at the affidavit signing."[27] That is true, of course, as the record just quoted shows. But none of these witnesses testified that Duenas *did* under-

stand what was transpiring, or that he *said* he did, or that anyone present who spoke Spanish could tell from talking with him that he did. From all the witnesses said about Duenas's *appearance,* one cannot tell whether he was a Shakespearean professor bemused into silence or someone for whom all of the English conversation and the seven-page affidavit were unintelligible gibberish.

Second, the Court says, "Duenas's testimony about his ability to understand English was inconsistent".[28] That, too, is true. But the only inconsistency to which the Court points is that Ricardo's statement that he understood no English followed by his admission that he understood when he was told, "sign here". I cannot fathom how that inconsistency is any evidence that Ricardo could read and understand a seven-page affidavit. If it were, then why did Ciavaglia ask that his summary of the affidavit be translated into Spanish for Ricardo?

Finally, the Court says that the trial court could have determined that Ricardo was not a credible witness because he could not have worked in a hotel kitchen as long as he had and not have understood better English, because he minimized how much of the affidavit was translated for him, and because of his responses and demeanor.[29] This, too, is all true; the trial court could have made all of these determinations. But a witness's lack of credibility cannot establish the opposite of his assertions. This is simple logic. The trial court may not have believed Ricardo when he said he could not understand English, but that disbelief is no evidence that Ricardo was a Shakespearean professor. Apart from Ricardo's credibility, there must be

---

27. *Ante* at 713.

28. *Ante* at 713.

29. *Ante* at 713–14.

some positive evidence that he *could* understand English—and not just *some* evidence—*clear and convincing* evidence.

Nothing in the record that the Court says has been overlooked has been omitted from the recitation of the evidence contained in this opinion. The Court cannot point to any evidence whatever that clearly and convincingly shows that Ricardo had the knowledge that the Family Code requires before a parent can voluntarily relinquish a child.

### C

Conspicuously, the Monteguts do not argue that their promise to Maria is enforceable. Even if it were, I would hold that such promises precluded Maria's affidavit of relinquishment from being effective. There is no question in this case that the promise was made; it was given to Maria in writing. Nor is there any question that Maria signed her affidavit of relinquishment only because the promises were made. Under these circumstances, I would hold that Maria's relinquishment was not voluntary.

### IV

The Court's strained view of the record casts doubt on the sincerity of its assurance that it is not unsympathetic to Ricardo's and Maria's claims. One ordinarily hopes for a little more generosity from one's sympathizers. But the true measure of the Court's non-unsympathy is reflected in its argument, never raised in the case, that, oh and by the way, Ricardo would not be entitled to his children even if his relinquishment had been involuntary because he may not have been the father, was unfit, and probably has no constitutional rights anyway. Before today, there has not been so much as a whisper of doubt that Ricardo was the father of Maria's twin sons. Both Ricardo and Maria swore to that fact. Even Maria's sister acknowledged that the boys "looked like" Ricardo.

Were the issue in question, it could easily be determined—but in a proceeding not based on his affidavit of relinquishment. There are also procedures for challenging Ricardo's fitness as a father, but they do not include indictment by the Supreme Court of Texas. To refuse to consider Ricardo's argument because it has not been raised properly, and then to make an argument against him that no one has ever raised, is not what immediately comes to mind when one thinks of not unsympathetic.

\*     \*     \*     \*     \*     \*

The record contains no clear and convincing evidence—I agree with Justice Owen for the reasons she explains that such evidence is required—that Ricardo understood and swore to the statements required by section 161.103(b) of the Family Code for relinquishment of parental rights. To the contrary, the evidence is overwhelming that Ricardo has lost rights among the most precious guaranteed by law simply because he does not understand English. If Ricardo could read the Court's opinion, he would no doubt be surprised (and dismayed) to learn that he is not entitled to a decision on the only claim he has ever made because his lawyer in the trial court phrased it differently than his lawyer on appeal. The one benefit of Ricardo's inability to understand English is that he will not be able to read of the injustice that has been done to him. He should at least have a paraphrase of the Court's opinion, however, just as his affidavit was paraphrased for him. I offer the following:

*¡Peligro!*

*Si usted no puede hablar Inglés,*

*usted puede perder a sus niños.*